## Yankey v. Clark.

(Decided May 4, 1928.)

### Appeal from Washington Circuit Court.

1. Assignments.—Persons procuring transfer of property to themselves from one mentally or physically infirm, to whom they stand in confidential relationship, have burden of showing that transaction was fair.

2. Contracts.—Where confidential relationship exists between parties to contract to transfer property of aged mother on her death to daughter in consideration of daughter's caring for mother and providing her with home, law looks with suspicion on contract.

3. Contracts.—In determining validity of contract between persons standing in confidential relationship for transfer of property, any reasonable influence obtained by acts of kindness or by appeals to feelings or understanding, but not destroying free agency, is not "undue influence."

4. Contracts.—Contract between aged mother and daughter whereby mother agreed to pay daughter reasonable amount for board and retained right to dispose of pension and interest received from certificates and dividends from bank stock and other personal property, but was prohibited from disposing of bank stock which was to be transferred to daughter on mother's death in consideration of care of mother, held not inherently unfair.

5. Contracts.—In action to set aside contract providing for transfer of mother's bank stock on her death to daughter in consideration of daughter's care of mother, evidence held to show that mother was woman of sound mental powers and to sustain burden on daughter of showing contract was fairly obtained without undue influence.

W. C. McCHORD for appellant.

W. F. GRIGSBY and MARSHALL DUNCAN for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

On April 25, 1924, the appellant, Mrs. George Ann Yankey, and her daughter, the appellee, Mrs. Woodsie Clark, entered into the following contract:

"This contract or agreement made and entered into this April 25, 1924, by and between Mrs. George Ann Yankey, party of the first part, and Mrs. Woodsie Clark, party of the second part, the post office address of both of said parties being Mackville, Washington county, Ky., witnesseth:

"That whereas Mrs. George Ann Yankey desires a permanent home during the remainder of her life, now, therefore, this contract or agreement is that her daughter, Mrs. Woodsie Clark, hereby agrees and binds herself to provide a permanent home for her during the remainder of her life, and the said Mrs. George Ann Yankey, hereby agrees and binds herself to pay the said Mrs. Woodsie Clark $5 per week during the remainder of her life, and at the death of the said Mrs. George Ann Yankey, the said Mrs. Woodsie Clark is to receive all the property that the said Mrs. George Ann Yankey

dies possessed of. Now the said Mrs. George Ann Yankey owns 15 shares of the capital stock of the Farmers' Bank of Mackville from which she is to receive the dividend during her life and the said bank stock is not to be disposed of without the consent of Mrs. Woodsie Clark and is to become the property of the said Mrs. Woodsie Clark at the death of the said Mrs. George Ann Yankey, and is also all the other personal property that she may die possessed of, including any cash in bank that may remain after the payment of suitable funeral expenses. In case of the death of Mrs. Woodsie Clark prior to the death of her mother, then the said personal property hereinbefore mentioned is to go to her heirs.

"In testimony whereof we have this day signed our names, this the day and date first above written."

On May 6, 1926, Mrs. Yankey brought this suit against her daughter to set aside this contract, claiming that on account of the infirmities incident to old age and bad health, she was feeble physically and mentally unable to transact business or to take care of herself, and that while she was laboring under these infirmities her daughter and the latter's husband, John Clark, fraudulently procured her, by reason of their undue influence over her, to execute this contract without any opportunity on her part to consult any one else, and that she signed the paper without understanding its purport or effect. The allegations of the petition were denied by answer. Proof was taken, and on final hearing the circuit court dismissed Mrs. Yankey's petition, and she appeals.

The facts are these: Mrs. Yankey is a widow of a federal soldier who died in 1914. He owned a tract of land in Washington county, which after his death was divided among his children, Mrs. Yankey retaining her dower interest in the land. These children consisted of four daughters and one son. The four daughters, who are now Mrs. Eddie Camden, Mrs. Dollie Powell, Mrs. Zuna Bottom, and the appellee, Mrs. Woodsie Clark, sold their interest in the farm to their brother, Lois Yankey, each receiving about $1,200 for her share. Mrs. Yankey lived with her son and his wife until her son was killed by lightning in the year 1921. He died intestate, so that Mrs. Yankey inherited the farm from him subject to the

dower interest of his widow. In due time this farm was sold to settle the estate of Lois, and out of its proceeds Mrs. Yankey bought 15 shares of stock of the Farmers' Bank of Mackville, which at the time of the contract above set out were worth about $3,000. The balance, amounting to about $1,100, she put in a time certificate of deposit of this bank. In addition to this estate, Mrs. Yankey drew a federal pension of $30 a month. For a while after her son's death, Mrs. Yankey lived around with her children. Her daughter, Mrs. Camden, lived in Illinois, and although Mrs. Yankey visited her, she did not wish to permanently live so far away from her old home and friends. Mrs. Zuna Bottom ran a boarding house in Harrodsburg, and, as the evidence satisfactorily shows, wanted her mother to pay more board than her mother could reasonably afford. Mrs. Powell lived on a farm near Mackville, and it was not convenient for Mrs. Yankey to get to church and visit her friends from this place. On the other hand, Mrs. Clark lived within walking distance of the church to which Mrs. Yankey was devoted and within easy visiting distance of all of Mrs. Yankey's friends. So Mrs. Yankey, a woman past 80 years old when this suit was filed, became very desirous of living permanently with her daughter, Mrs. Clark. She came to live with Mrs. Clark in the winter of 1923-24.

As to just what happened prior to the entering into the contract of April 25th, the parties are not in accord. Mrs. Yankey claims that on the day the contract was entered into she was seated on the porch of the home of her daughter when her son-in-law, John Clark, began to importune her to turn over to him and his wife the bank stock to which reference has been made. Mrs. Yankey claims that she demurred to doing this, stating that it was all that she had to live on and that she wanted to divide it on her death equally among her children, but that on the continued importunities of her son-in-law, she became worn out and finally told him "all right," and that she would let them have the bank stock. She says that thereupon her son-in-law went and got an automobile, took her to town, and had the contract drawn up, which she signed. She claims that for three or four years prior to entering into this contract, she had been becoming weaker, both mentally and physically. Her deposition, however, indicates that she was a woman yet of very good mentality. On the other hand, Mrs. Clark claims that soon after her mother came to live with her,

the latter broached the proposition to her of living permanently with her and then freely and voluntarily offered to make the contract which was later entered into. She says that her mother insisted from time to time that this contract be made, and that on the day it was executed her mother told her husband that she was not going to fool about it any more and for him to get a machine and take her to town right away for the purpose of having the contract executed. Mrs. Clark is corroborated as to what happened at the home on this morning by Mrs. Clark's father-in-law. The attorney who drew the contract testifies that he was told by Mrs. Yankey what she wished to go into the contract and that he dictated it according to her directions, that he read it to her and she thoroughly understood it, and that she was a woman of good mentality at the time. Mrs. Yankey's banker, Mr. Cull, testifies that after this contract had been entered into Mrs. Yankey told him all about it, stating that she felt that she had done the right thing, and that it had been on her mind for some time to do it. Mrs. Yankey's physician, her merchant, and a near neighbor of hers all testify to the strong mentality of Mrs. Yankey and to the fact that she was a woman not easily influenced. It is true that Mrs. Yankey's two daughters, Mrs. Bottom and Mrs. Powell, testify that their mother was easily influenced, but as we shall presently see, they were very much interested in this lawsuit and in the setting aside of this contract. Mrs. Yankey and the Clarks lived in peace and amity until February, 1926, with a possible exception of one incident which occurred in August, 1925. Mrs. Yankey herself admits that during this time she had the best room in the house, that it was well and comfortably furnished, that her food was good, and that while there was no fire in her room she did not complain of that because there was a fire in the room where the family assembled and with whom she wanted to be, and, as she says, there was no sense in building a fire in her room in addition to that in the sitting room. She frankly says that when she went to bed at night her daughter would heat an iron and warm the sheets with it so that it would not be cold when she retired. Further, at Christmas, 1925, they had a Christmas tree and exchanged presents. The incident which occurred in August, 1925, was very trivial and probably would never have been heard of except for the interference of her other daughters. According to Mrs. Yankey, Mrs. Clark reprimanded her for

doing some sweeping in the house and told her to get out, which Mrs. Yankey declined to do until her daughter had surrendered the contract. On the other hand, Mrs. Clark says that it had been a very dry season and her mother was doing some sweeping in the back lot, thus stirring up a lot of dust which she carried back into the house with her, and that she courteously requested her mother to desist.

Mrs. Camden paid a visit to this community in the fall of 1925, and then learned about the contract of April, 1924. There had been nothing secretive about this contract because the Clarks had had it put to record in the county clerk's office in June, 1924. The daughters, however, with the possible exception of Mrs. Powell, do not seem to have found out about it until Mrs. Camden's visit. Mrs. Yankey told Mrs. Camden about the incident in August, whereupon Mrs. Camden, as Mrs. Yankey testifies, told her mother that if she were her mother she would not stay with Mrs. Clark any longer. Mrs. Camden at once communicated to her sisters the news about the contract, whereupon Mrs. Powell, who admits that she does not speak to Mrs. Clark, approached her mother about the matter. Although she denies that she advised Mrs. Yankey to bring this suit, yet her admissions plainly indicate that she and Mrs. Bottom did all they could to influence their mother to leave Mrs. Clark and bring this suit. Mrs. Bottom testified that her mother, on being questioned by her, "owned up" to the contract, that she had talked to her mother about bringing this suit, that her sister, Mrs. Camden, told her that she thought it advisable to set aside this contract because she did not think it was right, that she sent for one of Mrs. Yankey's present attorneys who lives at Harrodsburg to confer with her mother about this suit, all of which makes it perfectly plain that the incident of August would never have been magnified into the cause of this lawsuit had it not been for the interference of these other daughters. It was on this evidence that the court dismissed Mrs. Yankey's petition, and, as we think, rightfully so.

The appellant relies on the recent case of Bull v. Slaughter, 216 Ky. 792, 288 S. W. 747, which merely applies the old rule to the facts of that case. But the facts of that case are materially different from those of this case. The rule which applies to both cases is that, where a confidential relationship exists between the parties to

a contract like the one before us, the law looks with suspicion upon it, and those who procure a transfer of property to themselves from one mentally or physically infirm, to whom they stand in confidential relationship, have the burden of showing that the transaction is fair. On the other hand, it is also the rule as laid down in Collier v. Dundon, 164 Ky. 345, 175 S. W. 635, that any reasonable influence obtained by acts of kindness or by appeals to the feelings or understanding but not destroying free agency is not undue influence. Tested by these rules, the case of the appellant must fall.

Analyzing the contract, we see that it first provides that Mrs. Yankey is to pay her daughter $20 a month for her board. The testimony of Mrs. Bottom shows that this was a most reasonable charge, for Mrs. Bottom got $9 a week from her boarders for accommodations no better, if as good, than Mrs. Clark was giving Mrs. Yankey. Mrs. Yankey got a pension of $30 a month. The difference between her board and pension, together with the interest from her certificate of deposit and the dividends from her bank stock, she was, so long as she lived, perfectly free to do with as she pleased. She could spend it all or give it to her children, and this is equally true of all of her personal property with the exception of the bank stock. This she could not dispose of without the consent of her daughter. While it is true that whatever was left of Mrs. Yankey's property when she died was to go to Mrs. Clark, yet there was no assurance that anything would be left with the possible exception of the bank stock, and even out of this the funeral expenses would first have to be met. There was nothing to indicate whether Mrs. Yankey might or not require a great deal of nursing and attention before she died. There was no present transfer of any property to Mrs. Clark. It all remained with Mrs. Yankey until her death. When that occurred, there might be no property to be transferred except possibly the bank stock. Even this might be used up if Mrs. Clark consented. So that it is impossible to say that the contract itself was not inherently fair. The record overwhelmingly establishes that Mrs. Yankey was a woman of good and sound mental powers. While the burden was on Mrs. Clark to show that the contract was fairly obtained, we think that she met this burden. Her testimony, that of her father-in-law, and that of the banker, the last of whom at least was a disinterested party, establish that this contract had long been the

cherished idea of Mrs. Yankey, which she finally carried into execution in order to obtain a permanent home among her friends and near her church. Further, the evidence shows that she was entirely satisfied with this home until her other daughters got wind of the contract and, as we think the evidence shows, got their mother dissatisfied with the situation. Mrs. Yankey failed to show that this contract was procured by any undue influence. On the contrary, Mrs. Clark has shown it was fairly entered into. This being so, we are of the opinion that the lower court did not err in dismissing the petition, and its judgment is affirmed.

Whole court sitting.