## Dixon et al. v. Dixon et al.

(Decided December 16, 1930.)

JAMES & JAMES and S. Y. JONES for appellants.

EDWARD W. CREAL and WILLIAMS & HANDLEY for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Joseph H. Dixon was the owner of a 130-acre tract of land in Larue county, known as the "home farm," and also three tracts of timber-land. It the year 1924 he executed a will devising the greater portion of his property to his nephew Lawrence Dixon, who had assisted him to some extent in carrying on his business, and declaring "my reason for preferring my nephew, H. Lawrence Dixon is this—he has been more like a child to me than a nephew, and all his life has been kind to me, has been obedient, and has looked after my business

and me." In the same will he devised a 33-acre tract of timber-land to his nephew Horace Dixon. On January 16, 1926, Joseph H. Dixon conveyed to Horace Dixon the 33-acre tract of timber-land mentioned in the prior will. The consideration was "One dollar in hand paid and other good and valuable consideration, and also the consideration of love and affection." On March 1, 1926, Joseph H. Dixon conveyed to his nephew Horace the home farm of 130 acres and the two remaining tracts of timber-land, one containing 12 acres and the other 20 acres, for the recited consideration of $1 and other good and valuable consideration, and also the consideration of love and affection, and also the further consideration of the said Horace Dixon supplying the wants, nursing, attention, and many other comforts needed by the aged and infirm, medical attention, food, burial expenses, and all other necessities of the said Joseph Dixon. During the latter part of March, 1926, Joseph Dixon made a new will.

By the first clause he bequeathed the remainder of his personal property of all kinds to Horace Dixon. After directing the payment of all just debts and burial expenses the will recited: "I gave him this for the same reason that I deeded him my farm recently, on account of his moving in with me to take care of me and comfort me and attend to my needs and wants in my remaining days."

In the second clause he devised to Horace Dixon any land or real estate that he might own at his death, and adding: "I make this provision of my will for the reason that I have heard rumors in recent weeks that the deed which I made to my farm to my nephew Horace Dixon, might be attempted to be held invalid at some future time, and believing that I have the right to dispose of my property as I see fit I make this will to insure my nephew Horace Dixon receiving the farm on which I live if for any reason the deed should be attacked after I am gone or after I should at some future time be incapable of disposing of my own business to my own choice. Another reason for the deed I made and this will to further insurance the carrying out of my wishes, is that I have heretofore helped my other nephew, Lawrence Dixon, in large sums of money, and at that time gave no financial assistance to my nephew Horace Dixon, and in this way it will more nearly even them up when

Horace has taken care of me and cared for me during the remainder of my life time."

Joseph H. Dixon died unmarried on August 11, 1928, and the last-mentioned will was duly probated by the Larue county court. On January 17, 1929, Lawrence Dixon and some twenty-nine other collateral relatives of Joseph H. Dixon brought this action seeking a cancellation of the two deeds executed by Joseph H. Dixon to Horace Dixon, and appealing from the probate of the will.. The grounds of attack were mental incapacity, undue influence, fraud, coven, deceit, and duress. On final hearing, the chancellor upheld the deed and reserved for future adjudication the appeal from the probate of the will. Plaintiffs appeal.

The facts are these: For several years prior to March, 1926, Joseph Dixon lived with the tenants who occupied his home farm. Of these John Sam Taylor and wife lived with him in 1924, George W. Dixon and wife in 1925, and John Ross and wife from November, 1925, to March, 1926. All of them lived with him under contract made by him, though it is claimed by Lawrence Dixon that he assisted in making the contracts. The quarters assigned him in his home were small, cold, and uncomfortable, and the relations between him and the tenants were not pleasant or agreeable. His physical condition was such as to require that he and his clothes be frequently washed, but there was no one on the place willing to perform or who did perform this service. At that time and at the time of the execution of the two deeds Horace Dixon and his wife were living about two miles away from the home of Joseph H. Dixon on a farm belonging to her. After the execution of the deeds, they moved to the home farm of Joseph Dixon, and the evidence is practically uncontradicted that they looked after his wants in every way, that through the menial services performed by them his clothing and person were always clean, and that they carried out their contract to the letter. The evidence in regard to the execution of the deeds may be summarized as follows: Prior to January 13, 1926, Horace Dixon went to an attorney at Hodgenville and had him prepare the deed to the tract of land known as the Tally tract, which had been previously devised to Horace by the will of 1924. On the same day Horace arranged with the deputy clerk to go to the home of his uncle and take the acknowledgment. On that day the deputy met Horace at Upton and the two proceeded

to the home of the grantor. While Horace and his uncle were engaged in conversation in the kitchen, Lawrence was seen approaching. According to Horace, his uncle said that he did not want to go on with the transaction, as he did not want Lawrence to know his business. On January 16th following the same deputy came from Hodgenville, a distance of 18 miles, to the home of Grover Hodges. Horace took his uncle there, and the deed was executed and acknowledged. The deed was then placed of record. Before and after the execution of the deed Horace was in the habit of going to his uncle's once a week for the purpose of shaving him, but it does not appear that he attended to any other business for his uncle. Lawrence, it seems, had been looking after his uncle's business in a way, and would collect and bring him money. Some of the money he retained and executed duebills therefor. Some time prior to the execution of the first deed his uncle surrendered a note which he held against his father and also certain duebills. The notes and duebills aggregated about $1,000. A few days before March 1, 1926, Horace again visited the attorney at Hodgenville and had him prepare the deed conveying to him all the remaining lands. An arrangement was made by the same deputy clerk to go to the home of Grover Weldon on March 1st. On that day Horace took his uncle to the home of Weldon, where his uncle signed and acknowledged the deed. The reason that he took his uncle to the home of Grover Weldon was that his uncle did not want Mr. Ross to know about the transaction. Afterwards Weldon approached Ross for the purpose of buying out. A deal was made by which Ross accepted $250 and surrendered possession to Horace on March 6th. A few weeks later Horace visited Hodgenville and had the same attorney prepare the will which was executed by his uncle on March 25, 1926.

On the question of mental capacity, some twenty-two witnesses, including Lawrence Dixon, a physician, the tenants who occupied the home with Joseph H. Dixon, and others who claimed to have seen him more or less frequently, gave it as their opinion that he was not competent to contract. On the other hand, a large number of witnesses, including two physicians, those who were present when the deeds and will were executed, and others who knew Joseph H. Dixon more or less intimately, expressed the opinion that his mind was all right and that he was capable of understanding the nature and

effect of the instruments that he had executed. There was also evidence by some of the witnesses for each side that Joseph H. Dixon sometimes said that he was crazy. Time forbids an extended statement or review of the evidence. The fact that Joseph Dixon sometimes stated that he was crazy is not very persuasive that such was his condition. All of us are inclined, when we forget or overlook something that we should have done, to make the same statement concerning ourselves, but we do not intend the statement to be accepted as true, and not one of us would make the statement if he believed that it would be used as evidence of mental incapacity. The facts on which witnesses for appellant base their opinions that the grantor was incompetent are not of a very convincing character. Inability to name all of one's relatives, the habit of changing from one subject to another, and occasional forgetfulness, are so common to all of us that, considered singly or altogether, they offer a very unsubstantial basis that one of whom these things are said is incompetent to make a deed. Another circumstance on which some of the witnesses for appellant predicated Mr. Dixon's unsoundness of mind was the fact that he talked about the road that would some day go through his place, and told them that a road would some day go through and a city would be built on his place. Stranger things than this have happened, and, though it be true that the grantor evinced an optimism in which the rest of us may not be able to share, his prediction cannot be regarded as being so far-fetched as to indicate incompetency to make a deed. Our conclusion agrees with that reached by the chancellor, that Mr. Dixon, though old and infirm, had sufficient mental capacity to enable him to appreciate and understand the legal effect of the deeds.

But the point is made that, because of the relations between the grantee and the grantor, the burden was on the grantee to show the fairness of the transactions, and that not only was this burden not met, but that the secrecy attending the transactions, together with the preparations made in advance for overcoming any attack on the instruments, was sufficient to establish undue influence. Doubtless it is true as contended by the counsel for appellant that it is not necessary for the grantor and grantee to be living together in order to place on the grantee the burden of proof, but other elements are necessary. In this case it was not shown that the gran-

tee attended to the business of the grantor, or that the grantor depended on the grantee for advice or assistance, or that the relations between the two were of a confidential character. In view of his obligations to his children, an aged man often denies himself in order that he may make suitable provision for them, but, if he have no children, his first obligation is to himself, and there is no reason why he should deprive himself of the comforts of life in order that his collateral relatives may enjoy his estate. Nothing is worse than the condition of an old man without the comforts of home, and with no one to look after his wants, and, were we to hold that, whenever one who is old and infirm conveys his property to another in consideration of support, the deed is presumptively the result of undue influence, no one would care to undertake the burden, and it would put it out of the power of the old to secure the comforts of life in their declining years. Petty v. Pace, 207 Ky. 592, 269 S. W. 713.

Joseph H. Dixon's experience with his tenants had not been a happy one, and the time had come when it was necessary for him to make suitable provision for himself. We cannot delve into his mind and determine why he preferred Horace to Lawrence. He may have been dissatisfied with the manner in which Lawrence attended to his business, and may have objected to the execution of duebills by Lawrence. He may have felt that Horace and his wife would look after his wants more faithfully than Lawrence and his family, and that he would be happier with Horace and his wife in his home. At any rate he made the deeds. Horace and his wife carried out their contract. For two and one-half years they performed the most menial services. The grantor, the principal person concerned, did not complain or ask a rescission. Appellants, though claiming now that he was mentally incapable of making the deed, took no steps to have him declared incompetent. As the grantor obtained what he desired, it was not a bad bargain so far as he was concerned. The burden which Horace undertook was one which few people care to assume. No one could tell how long the grantor would live, and the extent of the burden is not to be measured by what subsequently transpired, but by the situation existing at the time of the transaction with its attendant possibilities. Parsley v. Parsley, 233 Ky. 42, 24 S. W. (2d) 931. Considered in this light, the transaction has none of the elements of

a one-sided bargain. Giving full effect to the evidence and circumstances relied on by appellants, we are constrained to hold, after careful consideration of the entire record, that they are sufficient only to raise a doubt as to the soundness of the chancellor's conclusion that the deeds were not obtained by undue influence, and, that being true, his finding will not be disturbed. Jenkins v. Dawes, 183 Ky. 25, 207 S. W. 689.

Judgment affirmed.

Whole court sitting.