## Henson et al. v. Jones et al.

(Decided Feb. 14, 1933.)

466

E. L. COOPER for appellants.

C. B. COX and JOHN G. LOVETT for appellees.

OPINION OF THE COURT BY CREAL, COMMISSIONER—
Affirming.

Dr. E. A. Henson, a resident of Marshall county, died in June, 1930, at the age of 87. He left surviving, as the issue of his first marriage, W. L. Henson, and Deliliah Henderson Potts; and Valeta Etheridge, Irvan Jones, and Riley Jones, the children of his daughter Izora Henson Cross who died prior to his death. He was also survived by Mollie Henson, the wife of his second marriage, but no children were born to this union.

Dr. Henson had acquired about 700 acres of land prior to his second marriage, and on April 11, 1929, by separate deeds conveyed to his wife, son, daughter, and two of his grandchildren, by definitely described boundaries, all of this land except about 50 acres, which was thereafter conveyed to his son who in turn conveyed it to his son-in-law, Clyde Gordon. He conveyed to his wife what is known as the home place, containing approximately 200 acres; to his son something over 200 acres lying on the Tennessee river and Beaver creek about 15 miles from his other land; to his daughter Deliliah a tract of 147 acres adjoining or near the home tract, and upon which she lived; to his grandson Riley Jones, 37 acres of a tract of about 150 acres near to or adjoining the home place; and to his granddaughter, Valeta Etheridge, about 60 acres of the same tract. He made no conveyance to his grandson, Irvan Jones. It appears in the record that Dr. Henson and one Faughn were jointly bound as sureties for Irvan Jones on a note for about $1,500, and this was assigned as the

reason he conveyed none of his land to this grandson. It further appears that Irvan Jones had executed a mortgage on a piece of real estate to secure this note or to indemnify the sureties. The sureties finally paid the note, and, after exhausting the amount realized from the mortgage, Dr. Henson paid something over $600 as his portion of the security indebtedness.

In October, 1930, Irvan Jones, Riley Jones, Valeta Etheridge, and Deliliah Potts instituted this action against Mollie Henson, W. L. Henson and wife, and Clyde Gordon and wife, seeking to set aside all the conveyances, alleging that at the time they were executed, Dr. Henson was suffering from the effects of old age, senility, mental derangement, and incapacity, and was incapable of making deeds or of taking a rational survey of his property and disposing of same according to a fixed purpose of his own; and, further, that Dr. Henson lived with Mollie Henson and very near his son, W. L. Henson, and a very close intimacy and confidential relationship existed between them, and that, taking advantage of that condition and relationship, they, by persuasion, flattery, and deceit, procured him to make the conveyance; that at the time W. L. Henson made the deed to his son-in-law, Gordon, the latter knew the conveyance from Dr. Henson to W. L. Henson was void for the reasons hereinbefore indicated; they asked that all the deeds be canceled, set aside, and held for naught, and that the lands of decedent be partitioned among his heirs at law.

By answer denying the grounds upon which plaintiffs relied for cancellation of the deeds, the issues were completed. On final hearing the chancellor granted the relief prayed for in the petition, and the defendants have appealed.

Forty or fifty witnesses were called and gave their depositions in chief or on recall; but it is unnecessary as well as impractical to attempt to give a detailed statement of evidence.

For appellees it is shown that Mollie Henson and W. L. Henson went to Benton, the county seat, and employed an attorney to prepare the deeds, and made arrangements for their later execution. A few days thereafter Dr. Henson, accompanied by his wife and her son by a former marriage, went to the office of the attorney, where Dr. Henson signed and acknowledged

the deeds, in all of which his wife joined, except in the conveyance to her. A witness who was in the attorney's office at the time, but in a room adjoining that in which the transaction took place, testified that Mrs. Henson did practically all the talking, and she heard her telling the doctor where to sign; that she heard little if anything said by Dr. Henson. The deeds were turned over to Mrs. Henson, and were not delivered to the respective grantees, but were lodged in the clerk's office. W. L. Henson paid the attorney for preparing and taking the acknowledgment to the deeds.

It appears that about 15 years prior to the death of Dr. Henson, during a critical illness, he called his wife and all his children to his bedside and discussed with them the disposition he had made of his estate by will.

In this will he made a different disposition of the property than from that made by the deeds; the wife being given a life estate in a portion of the land, and the remainder divided between his children.

According to the evidence, Dr. Henson at one time had a large and lucrative practice, and had acquired considerable personal estate; but before his death, his practice had become very limited, and his personal estate depleted. Mrs. Henson's son lived with or near her from the time of her second marriage to the death of Dr. Henson, and there is evidence to indicate that his extravagances in the way of a number of new and rather expensive automobiles played a part in the dissipation of Dr. Henson's personal estate.

A number of witnesses testified to statements made by Mrs. Henson to the effect that, in the later years of his life, Dr. Henson was not capable of attending to his business or of dosing out medicine for his patients, and there is evidence as to similar statements made by his son. It is further in evidence that W. L. Henson made statements complaining of the extravagance of Mrs. Henson's son, and inferred that she had caused the doctor to make away with his will, and that little would be left for his children; also that Mrs. Henson made statements indicating that W. L. Henson had been instrumental in having the will disposed of, and would profit to the disadvantage of the others.

In the later years of his life it is shown that Dr. Henson was seldom, if ever, left alone, and his wife or

her son would usually accompany him when on professional calls; that he did not attend to any business in the absence of his wife or son, and that either one or both of them were present, and wholly directed, or in a manner controlled, his business affairs; that his wife usually selected and dosed out medicine for patients, or watched to see that the doctor properly selected and dosed the medicines; that on account of his condition she went to other physicians when in need of medical advice or treatment. Some witnesses testified to having been in Dr. Henson's house when he would be talking to and prescribing for imaginary patients, and one witness testified to having observed him sitting in a chair with his hands extended as though holding lines, and his speech and actions indicating that he thought he was driving. There is evidence indicating that on one or more occasions he had given strychnine instead of calomel, or the reverse. A number of witnesses gave as their opinion that Dr. Henson was incompetent to manage his business affairs, and did not have mind sufficient to know or understand the nature, extent, or consequence of a business transaction.

As a whole the evidence for appellees conduces to sustain their allegations as to his mental condition in the later years of his life, and there is evidence tending to show, or from which it might be reasonably inferred, that undue influence was exerted upon Dr. Henson by his wife and son to procure the execution of the deeds.

Mrs. Henson denied that she had made statements that Dr. Henson was incapable of managing his affairs or looking after his practice, or that she sought medical advice and treatment from another physician for minor ailments because of the impaired state of mind or memory of Dr. Henson. She stated that at one time she did go to another physician for treatment for an infected foot because Dr. Henson did not have on hand the necessary medicine to be used in the treatment; however, the doctor who treated her for the infection testified that she called him a number of times, and at one time he was called to her home; that she did not come to him at the time she had an infected foot because Dr. Henson did not have the proper remedies, as they were very simple, but that she said she was coming to him because Dr. Henson's memory was getting bad.

Mrs. Henson and W. L. Henson testified that they went to see the attorney with reference to the preparation of the deeds at the request of Dr. Henson, and he could not accompany them because he had an appointment with a patient from a distance; that their real purpose in making the trip was to look after some matter in connection with the Irvan Jones note upon which Dr. Henson was bound as surety; but Mrs. Henson admitted that she took Dr. Henson's deeds with her and left them with the attorney. They testified that Dr. Henson was capable of transacting business, and that he knew and understood and directed how the deeds should be made. The attorney who prepared the deeds stated that he had a part of them written when Dr. Henson called to sign and acknowledge them, and that he discussed the preparation of the others with him, and read them all over to him. He gave as his opinion that Dr. Henson was competent to transact business, and was capable of knowing and did know the nature, extent, and effect of the deeds he signed.

A great number of witnesses for appellant gave as their opinion that Dr. Henson was of sound mind up to the time of his death, and capable of transacting business and directing his affairs, and that at the time the deeds were made he had mind sufficient to know the nature and value of his estate, the objects of his bounty, and to dispose of his property according to a fixed purpose of his own. On the whole, it may be said that the evidence for appellants strongly tends to establish that while Dr. Henson was physically enfeebled, his mental faculties were unimpaired, and that he was capable of transacting business.

The question presented for determination is whether there is sufficient evidence of mental incapacity and undue influence to sustain the judgment. It is maintained by counsel for appellants that the evidence introduced to establish undue influence, dominion, and control by Mrs. Henson and W. L. Henson over Dr. Henson in fact merely established the opportunity for the exercise of those powers, with nothing of a probative value or effect to indicate the exercise thereof; and, further, that the evidence of appellees is not sufficient to show such mental incapacity on the part of Dr. Henson as rendered him incompetent to know and fully appreciate the purport, nature, and consequence of the deeds which he made to his wife and to his heirs-at-law.

It is true that undue influence is not to be presumed, nor can it be established by vague or uncertain evidence, nor by evidence merely showing an opportunity for or the possibility of its exercise. Jones v. Beckley, 173 Ky. 831, 191 S. W. 627; Childers' Ex'r v. Cartwright, 136 Ky. 498, 124 S. W. 802; Cecil's Ex'rs v. Anhier, 176 Ky. 198, 195 S. W. 837. But there must be evidence of a substantial and relevant consequence to establish it. Langford's Ex'r v. Miles, 189 Ky. 515, 225 S. W. 246; Bailey v. Waddy, 184 Ky. 451, 212 S. W. 459; Jones v. Beckley, supra. However, this court has often given recognition to the fact that direct proof of expressed declarations or overt acts of parties charged with exerting such influence over another can seldom be had, but must, as a general proposition, be established by circumstantial evidence, and the grouping together of numerous facts and circumstances, which, taken alone, might be considered insignificant, but, when viewed as a whole, would clearly tend to establish the exercise of such influence. Walls v. Walls, 99 S. W. 969, 30 Ky. Law Rep. 948; Livering v. Russell, 30 Ky. Law Rep. 1185, 100 S. W. 840; Sheeran v. Jarboe, 190 Ky. 840, 229 S. W. 111.

While the burden of proving undue influence is upon the one charging it, it is never greater than the duty of establishing it by a preponderance of evidence. McGee v. Brame, 176 Ky. 302, 195 S. W. 473; Johnson v. Stivers, 95 Ky. 128, 23 S. W. 957, 15 Ky. Law Rep. 477. And in weighing the evidence on such an issue, consideration will be given to the relationship of the parties, their ages, their physical and mental status; and, when there is a showing of mental incapacity and physical infirmity, less evidence will be required to establish undue influence.

To set aside a deed on the ground of mental incapacity, it is not sufficient to show that the grantor's powers of mind and body were impaired by age, but there must be evidence from which it is made to appear that his infirmity of mind was so great as to render him incapable of knowing or understanding the nature, meaning, and consequence of the transaction. Gillock v. Williams, 199 Ky. 169, 250 S. W. 836; Chrisman v. Quick, 174 Ky. 845, 193 S. W. 13; Wathens v. Skaggs, 161 Ky. 600, 171 S. W. 193; Lewis v. Lewis, 194 Ky. 172, 238 S. W. 410.

472

Standing alone, none of the acts, circumstances, or incidents revealed by proof are of great significance, and perhaps it might be said that the evidence of no single witness is sufficient to support the chancellor's finding; but when a comprehensive view is taken of the record as a whole, and each of the acts and circumstances is considered in its relation to all the others, there is much to lend color to the claims of appellees, and to form a substantial basis for the judgment of the chancellor.

As we have already pointed out, there is a sharp conflict in evidence; but the chancellor, who no doubt knew the witnesses or most of them, was in a better position to pass upon the facts and to determine the weight to be given to the evidence than we are. While the chancellor's finding of fact is not binding upon this court, it will be deferred to and given weight, and will not be disturbed where substantially supported by evidence, or where there is such conflict of evidence that the appellate court is left in doubt as to whether the evidence supports the judgment. Hollingsworth v. Avey, 182 Ky. 334, 206 S. W. 493; Hagan v. Hurst, 228 Ky. 645, 15 S. W. (2d) 446; Combs v. Casebolt, 233 Ky. 192, 25 S. W. (2d) 365; Helm v. Goin, 227 Ky. 773, 14 S. W. (2d) 183.

Judgment affirmed.