## Combs et al. v. Bowen et al.

(Decided Oct. 23, 1934.)

H. W. SULLIVAN and W. C. HAMILTON for appellants.

W. B. WHITE and REID PREWITT for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

On July 7, 1931, Seth Combs, a resident of Montgomery county, conveyed to his son, Robert Combs, his home farm consisting of about 90 acres, and worth about $2,000. In addition to his farm, he had to his credit in bank about $500. The consideration stated in the deed is as follows:

"For and in consideration of one dollar cash in hand paid, the receipt of which is hereby acknowledged by the said party of the first part, and the further consideration of the care and support of the said party of the second part has rendered to the said party of the first part, the receipt of which is hereby acknowledged by the said party of the first part, and the further consideration that the said party of the second part agrees to furnish the said party of the first part a home and remain with him as long as they live."

The deed also contains the further provision:

"It is one of the conditions and considerations herein that the said party of the second part shall

not deprive the said party of the first part of the possession of said premises during the life of the said party of the first part, and that the said party of the second part shall not take possession of said premises until the death of the said party of the first part."

Seth Combs died on February 12, 1933, survived by six children, including Robert Combs. Shortly after his death, this action was brought by the other children to set aside the deed to Robert on the ground of mental incapacity and undue influence. From a judgment canceling the deed, Robert appeals.

As to the following facts, there is no dispute. Mrs. Seth Combs died many years ago. After her death, some of the children lived with their father for a while, and then married and moved away. Chester Combs, a son, located within half a mile of the home place, and saw his father "once or twice every three months." Mrs. Fed Witt moved to Estill county, and saw her father once each summer. Pearl married and established her home in Powell county, and came home only once in twenty years, and that during her father's last illness. Belle, who had married and moved to the state of Florida, had not been home for eight years next preceding her father's death, and did not see him during his last illness or attend his burial. Mrs. T. M. Bowen, who moved to Illinois, came home in 1930, and again just before her father's death. After the departure of his children, Seth Combs lived alone on the home place. For a while, Chester Combs worked the farm on shares. Thereafter the same arrangement was made with Robert, who for about four years furnished his father with his meals, and managed the farm. During this time, Robert's wife kept the house in order. In February, 1931, Robert moved into the home with his father. About that time the deed was made and put to record. When the deed was made, the grantor was eighty-one years of age, and his eyesight was slightly impaired.

The evidence in behalf of appellees is as follows: Mrs. Bowen visited her father for about two weeks in the summer of 1930. He was then living by himself. In reply to the question, What was the condition of his mind at that time? she said, "Well he seemed forgetful, did not remember things. I did not think it was good." She had heard her father say he was crazy and no good. During his last illness her father told her he wanted the

property divided "among all of us." In her opinion her father in 1930 or 1931 did not have sufficient mind or memory to know his estate or its value, the natural objects of his bounty, or his duty toward them, but thought that he did have such mind and memory during his last illness. According to Chester Combs, his father told him that he was paying his way, and that his father was "kinda failing the last three or four years"; that at times when he went to see his father, his father did not seem to know him, and would forget what was said; that his father was very forgetful in the last few years, and not able to get around much. He based his opinion that his father's mind was bad because he was forgetful, and did not know him when he went up there. He admitted that he had not done anything for his father during the last few years, and that Robert had boarded him, had fixed up the house, and had taken care of the place. Mrs. Fed Witt testified that her father did not know her when she came in 1932; that she would tell her father who she was, and a little later he would seem to forget and ask her again who it was. While there, there were times he would know them and times when he did not. She did not notice anything wrong with his mind except his memory. He seemed to remember things that had happened many years ago, but did not remember things that happened right at the time. She also testified that her father was weak physically, and hardly got off the place in 1931, and that Robert took care of her father. Hack Shrout, who lived on the Seth Combs place about fourteen years ago, and who was not related to any of the parties, testified that at the time he was living there he thought Mr. Combs was very peculiar. He saw him go off on the place, sit on a stump for two or three hours by himself, and would not come to his meals when called. At times he seemed to have as good a mind as anybody, and at other times he did not. Mr. Combs would have him get ready to do a thing, and when the time came would change his mind and tell him he was not ready to do it. Mr. Combs was mean, they did not get along very well, and he left before the year was out. He had only seen him occasionally in passing, and knew nothing about him since he lived there. Sterling Hisle testified that Mr. Combs was quite a fisherman, and that about four or five years ago he remembered seeing Mr. Combs, and that Mr. Combs had told him that he had been down on the creek fishing,

and had gotten lost; that Mr. Combs also told him that he did not seem to have much mind left. Mrs. Dillard Woosley lived on the adjoining farm to Mr. Combs, and had often talked to him. When asked about the condition of his mind, she stated that she thought he was more forgetful, and did not remember things, and that this was more the matter with him than the condition of his mind. She also said that when he was sick he called things by different names, and did not remember things very long; that aside from being forgetful she had never noticed anything at any time unusual about the way he talked, or the way he acted, and that she had never heard anything about his mind being bad until after his death. Strother Witt testified that he could not say that he noticed anything about his (Mr. Comb's) mind, except that he was in a better humor at some times than he was at others. Jim Tom Boone, a stepson of Chester Combs, testified that Mr. Combs sometimes called things wrong, that is, he called people by different names than their right names; that he talked all right except when he called people different names, but that he could not recall a single instance, or any name or names that he had called wrong. According to Mrs. Tilford Bowen, she remembered one occasion when she went to Seth Combs' home for the purpose of buying a cow. She noticed that there was something wrong with him in that he would talk a few minutes and ask the same things over again, and that he wanted $60 for the cow, which she stated was unreasonable. She also testified that Mr. Bob Combs had said to her that the old man was crazy, ''and I don't know what we are going to do about him.''

On the other hand, Robert Combs, the grantee, testified as follows: About Christmas, 1930, his father told him that he was not able to go to his house for his meals, and wanted him and his family to move up and take care of him, and would deed him the property. Some time in the month of February, 1931, he began making arrangements to move into the house with his father. The house was in bad condition, and he spent about $400 for material and labor on the house. About a week before the deed was made, his father told him to go to Indian Fields to see Stanley Clay, a lawyer there, and find out if he could prepare the deed. He saw Mr. Clay, and reported this fact to his father. The morning the deed was made his father suggested that they go and have it made. When

they reached Mr. Clay's office, he told his father to tell Mr. Clay what he wanted done. His father told Mr. Clay that he had taken care of him, and agreed to continue to take care of him the rest of his life, and he wanted to deed him the place reserving a life estate therein for himself. After that he left, and the deed was prepared, signed, and acknowledged. The next day he lodged the deed for record in the Montgomery county clerk's office. He had boarded his father for some four years before he moved into the house, and his father had not paid him 1 cent therefor. He continued to take care of and feed his father for the rest of his life, and bought some articles of clothing for him. His wife did the washing, cleaned up his father's room, and they all nursed him during his last illness. His father was sick for about forty-seven days. His father had only had a doctor with him once or twice in the last three or four years before he took sick the last time. He had not used any influence of any kind on his father to get him to make the deed, and did not mention the making of the deed except when his father said something about it to him. Never at any time did he notice anything unusual about the condition of his father's mind. His father always knew him and his family. Aside from the fact that his father's eyesight was bad, he was in strong physical condition for his age, and his mind was good at all times. He denied that he told Mrs. Tilford Bowen that his father was crazy. Stanley Clay testified as follows: He was a practicing attorney and merchant. He lived about three or three and a half miles from Robert Combs, and had known Mr. Seth Combs for several years. Mr. Combs had traded with him at the store. When they arrived, Robert told his father to tell Mr. Clay what he wanted done. Mr. Seth Combs told him that Bob had taken care of him and had agreed to take care of him for the rest of his life, and wanted a deed prepared reserving a life estate therein. He prepared the deed. It was read over to Mr. Combs and signed and acknowledged by him. He remarked at the time to Mr. Combs that he was a remarkable man for his age. He talked all right, appeared to be a rational man, and he did not notice anything unusual about him. Chester Everman, who took the acknowledgment to the deed, testified that when he talked to Mr. Seth Combs, his mind seemed all right. He did not notice anything unusual about the way he talked, or the way he acted,

and had never at any time noticed anything unusual about him. Mrs. Walter Vivion, who was in business at Kiddville, testified that she had known Mr. Seth Combs for a number of years, that he was in their store every week or two for the last several years until the fall of 1932. When he came, he made small purchases of tobacco, and something for Woodrow, the son of Robert Combs. She talked to him every time she saw him. He talked rationally, and she had never at any time noticed anything unusual about the way he talked, or the way he acted, and that he always knew her. Simpson Garrett, a neighbor who knew Mr. Combs well, and saw him frequently, testified that he knew Bob Combs took care of his father during the last two years, and also knew that his father went down to Bob's house for his meals for three or four years before that. During the time he had known Mr. Combs, he never noticed anything about his conduct or talk that indicated there was anything wrong with him. He appeared at all times to be rational, and always knew him. He attended to his own business until the last two years, kept his business to himself, and was in a good physical condition for a man of his age. In his opinion his mind was all right until his last illness. Willie Garrett, a mail carrier, often saw Mr. Combs walking around. Mr. Combs talked all right, and acted in a rational way. Dillard Woosley, husband of Mrs. Dillard Woosley, a witness for appellee, testified that Bob furnished his father's meals for about four years before he moved into the house, and had made many improvements in the house. In summer time he would see Mr. Combs walking up and down the road. He had seen him two or three times a week, and had talked to him at least once a week until he died. In his opinion Mr. Combs had a good mind and knew what he was doing when he made the deed to Robert Combs. J. E. Henry, who sold Raleigh products, saw Mr. Combs two or three times a year up to 1932. He saw him in 1931 and talked to him. He talked all right, and his mind was apparently all right. He never at any time noticed anything unusual about him. Harry Hadden, a mail carrier, had known Mr. Combs for years, and had been intimate with him. His mind was all right at all times. His talk and acts were perfectly rational. Tom Pasley entered into a contract with Mr. Combs in 1930 to saw some timber. While the mill was there on Mr. Combs' place, he saw Mr. Combs every day. He was interested in what they were doing, and

kept up with them. He would often call their attention to a tree they had overlooked cutting. Mr. Combs knew how to take care of his interests, and did do so. The first part of the year 1931 he bought some hay from Mr. Combs, who knew what he wanted for it. Mr. Combs was a strong-willed man, and strong physically for his age. Never at any time did he notice anything unusual about his conduct. James Willie Barnett, who had known Mr. Combs for several years, never noticed anything unusual about the way he talked or acted. Matt Oldham, who had known him practically all his life, testified that he often talked politics with Mr. Combs, but Mr. Combs always knew the names of candidates and what offices they were running for, that he was very strong-willed, and if he made up his mind what candidate he was for, he could not be changed. Mr. Combs always knew him, and his mind appeared to be all right. Carl Woosley, a son of Mr. and Mrs. Dillard Woosley, knew Seth Combs, and had talked to him a few times in 1931, and also in the last year of his life, and never noticed anything unusual about him, or the way he talked or the way he acted. Brad Jefferson, who lived close to Mr. Combs for about four years, testified that he often saw Mr. Combs, that Mr. Combs knew him when they met, talked all right, and could carry on a good conversation.

While it is true that the witnesses for appellee express the opinion that Seth Combs did not have mind enough to make a deed, their opinions are all based on the fact that he did not recognize the witnesses at times, or that he appeared to be forgetful, or that he changed his mind, or that sometimes he was in a better humor than usual, or that he had gotten lost when out fishing, or that he remembered things that occurred many years ago better than things that had recently occurred. His failure to recognize people, or his getting lost, may have been due entirely to the impairment of his eyesight. All of us change our minds at times, and, as we grow older, we remember things that occurred many years ago better than things that recently occurred. Indeed it may be doubted if any man ever reached the age of eighty years of whom it might not be said that he was forgetful at times, or that he failed to recognize some one, especially one whom he had not seen for years. Even if there were no other evidence on the question, it must be conceded that the evidence of mental incapacity is not

very persuasive. But when this evidence is considered in connection with the other evidence of many disinterested witnesses, that the grantor was a man of strong will, that he attended to his own business, that he knew how to take care of himself in a trade, that his conversations and acts were always rational, there is no escape from the conclusion that he was mentally capable of making the deed in question.

Coming to the question of undue influence, we find the following situation: With the exception of Chester Combs, the grantor's other children had moved away, and were not in a position to look after him in his declining years, even if they desired to do so, which does not appear. For years appellant alone looked after, and was the mainstay of, the grantor. As he grew older, the grantor preferred not to live alone and go out for his meals. He then conveyed his home to appellant in consideration of past and future support. The grantor was satisfied with his bargain, and the burden which appellant undertook is to be measured by the situation existing at the time of the transaction with its attendant possibilities, and not by what subsequently transpired. Parsley v. Parsley, 233 Ky. 42, 24 S. W. (2d) 931. The grantor was in good health, and though he lived for only a year and eight months after the conveyance, he might have lived much longer, and the farm which was worth only $2,000 might have proved but a small remuneration for the services which might have been required. In the mind of every man there is the fear that in his declining years he may be ill and become a burden to others. Fortunate is he who has the means to pay for the needed service. Were we to hold that whenever one, who is old and infirm, conveys his property to another in consideration of support the deed is presumptively the result of undue influence, no one would care to undertake the burden, and it would be out of the power of the old to secure the comforts of life in their declining years. Dixon v. Dixon, 236 Ky. 608, 33 S. W. (2d) 611. In a number of cases we have upheld deeds made by aged persons in consideration of a home and future care. Petty v. Pace, 207 Ky. 592, 269 S. W. 713; Applegate's Adm'r v. Jones, 220 Ky. 205, 294 S. W. 1032; Hensley v. Hensley, 230 Ky. 575, 20 S. W. (2d) 444; Hall v. Drake, 232 Ky. 127, 22 S. W. (2d) 568; Parsley v. Parsley, supra; Dixon v. Dixon, supra; Schenk v. Schenk, 240 Ky. 237, 41 S. W. (2d) 1102;

Yankey v. Clark, 224 Ky. 346, 6 S. W. (2d) 274; Tunks v. Vincent, 241 Ky. 379, 44 S. W. (2d) 282. This case falls within the reasoning and express language of those cases, and a consideration of the entire record convinces us that in making the deed the grantor carried out his own wishes, and was not the victim of undue influence.

But it is argued that the chancellor found against the deed, and his finding will not be disturbed when based upon conflicting evidence. It is true that we repose great confidence in the conclusion of the chancellor derived from the conflicting testimony, and when the mind is left in doubt as to the truth, his finding will not be disturbed; but, as has often been pointed out, it is the province of this court to read the record for itself, and to determine the judgment that ought to be rendered. If a clear conviction results that the decision of the chancellor was erroneous, this court enters the judgment that should have been entered in the first place. Tunks v. Vincent, supra. Following this rule, we are constrained to the conclusion that the chancellor erred in canceling the deed.

Judgment reversed and cause remanded with directions to enter judgment in accordance with this opinion.