# McCutcheon v. Bichon et al.

(Decided March 12, 1937.)

W. A. BERRY for appellant.

EATON & BOYD for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

On June 27, 1934, appellees filed their petition in equity naming appellant as defendant. The appellant and appellees John, William, and Mrs. Gertrude McCutcheon Bichon are the children of William McCutcheon. Charles Bichon sues as the committee for Wm. T. McCutcheon, described as being enfeebled mentally and physically to such an extent that he was incapable of exercising his will or of forming a deliberate judgment. It is alleged that prior to May 1, 1934, Wm. McCutcheon owned his home, consisting of certain parcels of land comprising about 57 acres described, and also another tract of land situated in McCracken county containing about 150 acres.

It is alleged that for sixteen years prior to the institution of the suit Wm. T. McCutcheon has resided in the home "and permitted his son Charles E. McCutcheon to reside there with him, and that by reason of this close relationship and association, the enfeebled condition of his father, the son, a strong and active young man, gained and exercised undue control over his father to the extent that without consideration and with the intent to defraud, he, on May 1, 1934 procured the father to execute to him a deed to the home place." Cancellation of the deed was sought.

Appellant denied all the allegations of the petition

and pleaded affirmatively that he had lived all his lifetime with his father and mother; that during these times he had "protected them, took care of and looked after them"; that after his mother's death he remained with his father, taking care of him and rendering every possible service for his comfort, convenience, and welfare. He contends that the conveyance above mentioned was the free and voluntary act of his father, based on consideration, in that it was made because of the attentive service rendered, and that at the time of making the deed the father was mentally competent.

The allegations of the answer were denied by reply, with some affirmative matter which does not affect the issue. The reply was controverted of record. The issues being joined, proof was taken and on submission it was adjudged that on the 1st day of May, 1934, Wm. T. McCutcheon was not mentally capable of making a deed, and that it had been "procured * * * by the exercise of undue influence." The court ordered the deed canceled. From that order, this appeal is prosecuted.

The appellant contends that the court was in error in thus decreeing, because the proof shows that the grantor at the time of the execution of the deed was of sufficient mental capacity to realize the effect of his act; that no undue influence was exercised by grantee over the grantor, and there was an expressed preconceived purpose or intent to convey, and ample consideration therefor.

The contrary is vigorously argued by appellees. Each party invokes certain rules of law and equity. Appellant urges that the cancellation of an executed contract of such a solemn nature demands the exercise of extraordinary power, and ought not to be decreed except in a clear case where fraud is clearly proven; that the chancellor below erroneously held the proof to justify the cancellation of the deed on grounds of undue influence. Appellees invoke another rule, to the effect that where parties to a contract occupy close relationship toward each other, the courts will view a transaction between them with some degree of suspicion; that the general rule is changed and the burden of establishing the good faith of the questioned transaction falls upon the one seeking to uphold the contract.

The deed in question was executed May 1, 1934;

about the middle of June of the same year Wm. T. McCutcheon was found to be mentally incompetent by a court proceeding. At the time of the conveyance the father was about eighty-one or two years of age, and the son Charles about thirty-five. Mr. McCutcheon's wife had died in 1918. She was an invalid during the latter years of her life. Mr. McCutcheon's children, except Charles, had married early in life and made homes for themselves in the neighborhood. They had at all times shown considerable interest in their father, giving him such attention as would naturally be expected from children. This is particularly true of the daughter. Prior to the execution of the deed, there was no showing of ill feeling between the members of the family. Any ill feeling, and there is evidence of such, developed after the execution of the deed, seemingly based on what they term the "unfairness" of the effect of the conveyance.

In addition to the approximately 57 acres of the home place conveyed to appellant, the father owned about 150 acres of farming land in the same county, not far distant from the home place. As to the relative values, there is considerable difference of opinion, and the proof is not as full as it might have been. It may be said, however, that there is no argument but that the home place is by far the most valuable of the two tracts. The question of the equity here, in so far as value is concerned, need not be considered except as bearing on the main question. We have frequently held that a person who is mentally capable, and understands the nature of his act, may, in the absence of a showing of fraud or undue influence, convey his property for less than it is worth or may give his property to a relative. Risner v. Risner, 261 Ky. 359, 87 S. W. (2d) 970. We have also held that an agreement to support one for life is a valid consideration. Combs v. Bowen, 255 Ky. 802, 75 S. W. (2d) 513; Tunks v. Vincent, 241 Ky. 379, 44 S. W. (2d) 282.

The record also shows, if that fact be pertinent, that upon the death of the mother in 1918 the father proposed an amicable division of her property, which in part consisted of some real estate. This proposal was carried out by each taking a portion of the real estate and agreeing to pay the father a certain sum each year, evidently in lieu of his courtesy. As far as

the record shows, the plan has been adhered to. In this division appellant received a small tract adjacent to the "home place," and the others likewise received small tracts.

Taking up the proof, under the assumption that appellant had the burden of showing that the transaction was fairly consummated, we shall review to some extent the evidence brought out by appellant. Omitting as far as possible such proof as seems to be undisputed, the appellant shows that he had lived at the home place since his birth; that his mother was afflicted with rheumatism for six or seven years prior to her death in 1918. He says that during this time he had to help her out of bed; put on her clothes and assisted her in walking from place to place. After his mother's death, the father asked appellant to remain with him, saying that if he should leave there would be no one to look after him. Appellant says that he paid $135 rent per year up to 1930, when the father relieved him from further payment. At various times the father said he wanted him to have "far ahead of the rest," and wanted to deed him the place. This occurred as far back as 1925. At one time in 1930, when appellant and his wife were having difficulties, it was suggested by the father that if appellant would get a divorce he would then deed him the place, the inference apparently being that the old gentleman did not want the wife to have any interest. When the divorce was granted, appellant relates that the father said:

> "We are living here alone. I want you to have this place. You have done the best you can. Your family is busted up, and go ahead and I'll give you the place."

Then is related some instructions in regard to the drawing up of the deed. Appellant says that the act on the part of the father was of his own accord, without any influence on his part. He says, "Whatever I done for him was done free. I asked for nothing."

On cross-examination appellant said that during his mother's illness his father did very little toward waiting on her; that he did the greater part of it. He admits that the brothers and sister came to the home quite frequently during the mother's illness, but she

looked to him to see that she received the necessary attention. After the mother's death, the father quit the market-gardening business in which he had been engaged, and said to the son, "You go ahead, I am living with you now."

Just prior to the making of the deed, appellant went first to his brother John, along with his father, and said he wanted to divide the property. Appellant said that his father wanted to give him the home place and wanted to know if it would be all right with John. John answered, "See the others, whatever they say. You can divide it up if they want it." On this occasion the father said, "I come down here with Charles to see about dividing it up." Appellant and his father then went to see Will and substantially the same conversation took place, except it was said by Charles, "Will, we want to settle up papa's estate, what about it? I just come from John's and he said it was all right." Will replied, "Now listen Charles, I will do whatever the rest do, I won't be a black sheep." Appellant then approached the sister. We quote in substance the sister's testimony:

"They come down, brother and papa together, and papa said that he wanted to divide the property, and brother said he wanted the home place; said that was how papa wanted it. I asked papa and he said 'yes' he wanted it divided that way. I said, 'brother, you know papa does not know what he is talking about, let it stand until his death. I think it should be divided equally, let it stand.' He said that John and Will said it was all right with them if it was all right with me, and I said 'it isn't all right with me that way. Let papa keep his land,' and I said 'papa that is the worst thing you can do to give your home away,' and he said, 'Charles will take care of me,' and I said, 'papa he hasn't so far you know.' "

After these conversations appellant, at the suggestion of his father, had prepared a deed conveying the home place to him, and in a few days the deed was executed. It further appears that shortly after the conveyance was made the brothers and sisters took steps to and had held the above-mentioned inquiry.

Appellant produced three or more witnesses who,

prior to May, 1934, had heard the father say that Charles was good to him, and he intended to convey him the home place. Some of the witnesses testified as to the son taking care of and looking after the father. One who had lived a neighbor to Mr. McCutcheon for twenty-five years or more, and had been rather intimate with him, noticed nothing wrong with his mental faculties, and expressed the opinion that even up to long after the deed was made he "knew at all times what he was doing."

Mr. and Mrs. Page, neighbors for twenty-five years, said that he knew during the last six or seven years "exactly what he was doing." They also said that they had heard him say that Charlie had taken care of him and his wife; that the others had a home; and that he was going to give Charlie the home place.

Another witness, who was an associate, did not notice any change in his mental attitude in the last four or five years, suggesting that he was perhaps physically not as strong, and on account of poor eyesight "does not recognize me until I get within four or six feet of him." His groceryman saw no change in his mental attitude in the last ten years. He saw him and talked with him once or twice a week. Fred Smith had known the old gentleman for a long time and had seen him frequently, "though only once in the last six or seven months." This witness said, "I can not see much difference in him now and back when I first knew him. I admit he can't see as good as he used to, but I can't say but what his mind is as good as it ever was." An insurance agent who had known Mr. McCutcheon for twenty years says he had seen him in his home several times during each year; that he wrote his property insurance; and that in his latter years he noted no change except that he was getting older. To this witness the old gentleman more than once had said he wanted Charles to have the home place; once he said, "It looks like they don't want Charles to have the home place. I want him to have it." He said the old gentleman had sufficient mental capacity in May, 1934, to understand the nature and effect of a contract.

The sons William and John, the daughter, and her husband testify that the old man's mental caliber was such that he did not know the purpose and effect of a

contract; that when he signed the conveyance he did not know what he was doing. They all insist that since an accident to the father some two or three years prior to the suit, he had had spells of some kind; one of his eyes had been particularly bad. One said, "His mind is weak; he is like a child." "He complained of the treatment Charles was giving him." "It seems that he is completely dominated by his son Charles." "I don't think he knew the consequence of his act when he made the deed." "Since he made the deed he had not been friendly with us." One son said when he visited his father's home he would tell him, "I'm going to give you this farm, you have done more for me than anybody." "Lots of times he doesn't know anything." This witness also says that after the trial (referring to the inquest) he said he had never signed any deed and did not intend to sign any until he died. Asked the pointed question on cross-examination, "Don't you think your father knew what he was doing and the effect of his contract when he made that deed?" he answered, "No, I don't. If he had he would have told me that night after me and my wife went up there and talked to him about it. He denied it to the last that night."

Another son says that after the accident to his father his mind was bad. This witness details that on one occasion he was driving by his father's house, and slowed down and called to his father, who was on the sidewalk, and said, "Hi, Mister, is this where W. T. McCutcheon lives, and he said, 'Who?' and I said, 'Does W. T. McCutcheon live here?' I want to see him. I was just kidding him you know, and it was a long time before I could make him understand what his name was, and when he found out who I was he hugged me and asked how my wife was." It was this witness' idea that after the injury to the old gentleman anybody could influence him, and when asked as to how Charles used his influence, said that he bought beer for him; that his chances to influence him were good because he lived with him.

The daughter testifies that she gave the father considerable attention, taking him to her home, bathing and shaving and taking care of his bed clothes. She noted that about three years ago (which would have been 1930 or 1931) he quit coming to her home; that

she asked him what was wrong and he said he did not like to "come down twice a week, I will let Charles shave me." For this reason, she thought Charles was exerting his influence, but added that she thought maybe her father was mad because "I had got after him about striking a match on a swing I had just painted."

The foregoing is the substance of the testimony of the two sons, daughter, and son-in-law of Mr. Mc-Cutcheon. Leaving the members of the family, we find one witness expressing the view that the old gentleman was weak-minded, "because about a year ago (1933) I saw him up at Mrs. Bichon's home and he said that his mind was bad. I got after him about going from Mrs. Bichon's to Marie's house by himself, walking alone. I told him he couldn't do that and he said, 'I know I shouldn't, my mind is bad, and I can't see nor hear good.'" This witness had seen him shortly before that and she says, "He appeared very well that night; did very well in talking, only he would be talking on one subject and then turn the subject suddenly to something else. Seemed like he couldn't remember, but otherwise did very well."

Another witness said that he would talk about things that happened long ago, "he did not seem to remember; would say the same things over and over." She did not think he would know the value of his estate, nor how to dispose of his property. This witness was a relative. Another witness expressed doubt as to the old gentleman's mental capacity because he failed to recognize him on one occasion, and also because Charles told him that his father did not know what he was doing all the time. A cousin saw him and observed his mental condition. He says, "In the first place he had to be told who I was, and who uncle Charley was, and after he found out who we were he was all right." It developed that this witness had not seen Mr. McCutcheon very often in the last few years. However, this witness expressed the opinion that his mind was blank, though on cross-examination said, "His mind comes and goes." Another witness went in a room where Mr. McCutcheon was and he said, "He did not know me." However, when he found out who the witness was he talked all right, "he talked about the railroad and asked me how I was getting along, and how I was doing." Another witness said the old gen-

tleman was absent minded; that he did not seem the same, he seemed to forget, but he thought it was because he was getting old.

A few laymen, other than relatives, testified for plaintiffs, and the substance of the testimony was practically the same as the foregoing. Six physicians testified in the case, four for appellees and two for appellant. Some of these had been sent to see Mr. McCutcheon shortly prior to the time of an inquest held in June, declaring him incapable of managing his estate. One doctor says that Mr. McCutcheon was questioned regarding his property, his schooling, and his family. "He did not remember his wife's maiden name, nor the names of some of his daughters-in-law. He was inclined to study a long while before giving answer to any question. Sometimes by a little prompting or a lot of time in thinking he could remember a few things of that character. He said he went to school at Hinkleville, and also said he went to school at Hickman, and we couldn't tell whether he meant he had gone to school in one place or the other, or both." Evidently there were schools at both places where Mr. McCutcheon might have attended at different times. He was asked about his home place and said he had 200 acres, and finally acknowledged that he had only 200 acres altogether. In this he was correct, if other witnesses state correctly the number of acres he owned. He was asked about the value of his property and "he had it pretty high." When asked if he had made a deed to his place, or had given it away, he said that he had not given it away and was not going to do so as long as he lived; said he had not made a deed to it. When asked to state whether or not from their observation he would know the meaning of a contract, one doctor said, "I didn't think so and don't yet."

Another physician, in company with others, examined Mr. McCutcheon and said that physically he was decrepit; on some subjects he was respondent to questions and was capable of telling what he wanted to do at that particular time. But one thing was very noticeable, and that was his memory. "It was with great effort that he could recall a past event." When asked to state whether or not he would be subject to dominance or influence, or of exercising his own purpose or controlling his will, the doctor did not think he was.

capable of deciding correctly or arriving at a correct judgment, "our judgment is necessarily based on memory."

Another doctor said, "I felt like a lot of his mentality had been destroyed, possibly by an accident. His memory was bad as to family matters and his property. He first denied that he had made a deed, then somebody reminded him of it, and he said he had made a deed to his son Charles."

Another doctor said his memory was a "little short and uncertain at times." Also, that his physical condition was not good; he did not walk steadily. "He seemed to be a little nervous, a little strained. He seemed to be pretty alert in his questioning * * * and answered promptly. He gave his age, his birthday 1851. I consider his mind as clear as the average man of 83. We find most people at the age of 83 are beginning to—not that they lose their mind, but their recollection is bad and memory is enfeebled as well as their muscles. He showed he was well up in age. He remembered that he had made the deed to Charles because he had been good to him." Asked if he had mind enough to make the deed in question, he replied: "I think Mr. McCutcheon knew what he was doing."

It is unnecessary to go into any more detail as to the proof on the part of appellees. We have read the record carefully and are not convinced that appellees have established such facts as would lead us to conclude that Mr. McCutcheon did not have the mental capacity to know his property and to dispose of it according to a fixed purpose of his own. Accepting the suggestion that due to the relationship of father and son the burden was on the grantee to establish the good faith of his deed, we do not hesitate to say that thus confronted he bore the burden. His proof demonstrates sensible reasons why the father would desire to have the son own, use, and enjoy the home place. There is no showing of fraud. The proof of any undue influence on the part of Charles is meager, and the evidence shows nothing more than an opportunity on his part to exercise undue influence. This is not sufficient to justify the court in holding that the undue influence was actually exercised. Applegate's Adm'r v. Jones, 220 Ky. 205, 294 S. W. 1032. It is always

necessary in such a case to adduce evidence showing that such influence was actually exercised. Crump et al. v. Chenault, 154 Ky. 187, 156 S. W. 1053; Childers' Ex'x v. Cartwright, 136 Ky. 498, 124 S. W. [802] 804. Such evidence must be "substantial and not vague, uncertain, or irrelevant matter which does not carry the quality of proof or is not of such a character as to induce conviction. Clark et al. v. Young's Ex'x, 146 Ky. 377, 142 S. W. 1032; Brent v. Fleming, 165 Ky. 356, 176 S. W. 1134." Maddox v. Maddox, 258 Ky. 121, 79 S. W. (2d) 402, 403, 406.

As to the charge of mental incapacity, we recognize the rule that the evidence of laymen on this question is to be limited to acts and circumstances, which may or may not indicate a lack of mind sufficient to enable one to contract. The question of the quality of mind is one peculiarly directed to the medical profession. As to the effect of the lay proof, we do not find anything in any of it which would tend to convince us that Mr. McCutcheon at the time of conveying the property did not have mind enough to know the effect of his act. True he was shown to be old and infirm; to some extent forgetful, living somewhat in the past as do most old persons. Some of the physicians say that he did not have mind enough to contract. This testimony is not convincing. As a basis for their conclusion, they do not detail such conditions or circumstances as would be other than persuasive.

This deed was what might be called testamentary in character and in such case "ordinarily a party is not required to produce as high a degree of proof as he is when the deed was made in a business transaction and involves the aspect of a trade. Wood v. Moss, 176 Ky. 419, 195 S. W. 1077; Stege v. Stege's Trustee, 237 Ky. 197, 35 S. W. (2d) 324; Schenk v. Schenk, 240 Ky. 237, 41 S. W. (2d) 1102." Shaver v. Weddington, 247 Ky. 248, 56 S. W. (2d) 980, 982. Also less proof of mentality is demanded where the conveyance is a gift, as distinguished from a trade or sale, and a deed will generally be sustained unless it is clearly shown that imposition on the grantor has been practiced. Schenk v. Schenk, supra; Risner v. Risner, supra; Belcher v. Belcher, 202 Ky. 104, 259 S. W. 54.

In cases where it is sought "to set aside a deed

on the ground of mental incapacity, it is not sufficient to show that the grantor's powers of mind and body were impaired by age, but there must be evidence from which it is made to appear that his infirmity of mind was so great as to render him incapable of knowing or understanding the nature, meaning, and consequence of the transaction. Gillock v. Williams, 199 Ky. 169, 250 S. W. 836; Chrisman v. Quick, 174 Ky. 845, 193 S. W. 13; Wathens v. Skaggs, 161 Ky. 600, 171 S. W. 193; Lewis v. Lewis, 194 Ky. 172, 238 S. W. 410." Henson v. Jones, 247 Ky. 465, 57 S. W. (2d) 498, 501; Dixon v. Dixon, 236 Ky. 608, 33 S. W. (2d) 611; Petty v. Pace, 207 Ky. 592, 269 S. W. 713.

In the case before us, the conveyance was made in consideration that the son would care for the father the rest of his life; this is not emphasized by counsel, but it is worthy of consideration. There was also the unexpressed consideration of recompensing the son for what he had done for both the father and the mother. We have shown much liberality in upholding such conveyances where the evidence did not clearly show undue influence or incapacity. Combs v. Bowen, 255 Ky. 802, 75 S. W. (2d) 513, and cases cited. We are justified here in applying the rule laid down in Allen v. Rogers, 262 Ky. 744, 91 S. W. (2d) 17, and cases cited, that the evidence necessary to set aside a deed on the grounds of incapacity must be strong and convincing. Middleton v. Skaggs, 263 Ky. 81, 91 S. W. (2d) 1016.

It is urged by appellee that since the chancellor found against deed his finding should not be disturbed, even though based on conflicting evidence. "It is true we repose great confidence in the conclusion of the chancellor derived from conflicting testimony, and when the mind is left in doubt as to the truth such a judgment is not disturbed. But it is nevertheless the province of this court to read the record for itself and to determine the judgment that ought to be entered. If a clear conviction results that the decision of the chancellor was erroneous, this court enters the judgment that should have been entered in the first place." We are of such conviction, so the judgment of the lower court is reversed with directions to set it aside and enter in its stead one decreeing the deed valid.