# Murphy v. Lester, et al.

Oct. 10, 1939.

C. A. Pepper for appellant.

R. W. Lisanby and S. D. Hodge for appellees.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

The appellant, J. S. Murphy, next friend of J. L. Murphy, a person of unsound mind, is appealing from a judgment in favor of the appellees, S. J. Lester and his wife, Mary Emma Lester. The suit was brought originally in 1937 by J. S. Murphy as committee for his father, J. L. Murphy, seeking to have rescinded a deed in which J. L. Murphy was conveyed a life estate in a house and lot by the appellees for the sum of $1,500 in August, 1936. He asked that, in the event the deed could not be rescinded, it be reformed so as to vest a fee simple title in J. L. Murphy. The sanity proceeding had in the county court in 1937 resulted in J. L. Murphy being found incompetent to manage and control his estate by reason of bodily infirmity and weight of age. Thereupon the appellant filed an amended petition in which he asked that he be permitted to prosecute the suit for and on behalf of J. L. Murphy as next friend, in the event the judgment in the county court was deemed void. While the chancellor appears to have taken no action on that request, the record shows that following the filing

of the amended petition the suit was prosecuted as though the request had been granted.

The appellees filed an answer and counterclaim in which they set forth among other things the conditions under which the property in question had been conveyed to J. L. Murphy, who was the father of Mary Emma Lester, and father-in-law of S. J. Lester. They denied the allegation that J. L. Murphy "by reason of his great weight of years and his bodily infirmities was so imbecile or of such unsound mind as to render him incompetent to manage his estate" at the time the property was conveyed to him. They set forth further that J. L. Murphy had made his home with them for about six years prior to August 15, 1936, and that he had promised and agreed to pay them a reasonable compensation for his care, and also that the value of such services was worth $25.00 per month, or a total of $1,800; that there was an indebtedness of approximately $1,500 against the property where they made their home (the property in dispute) which was paid by J. L. Murphy prior to the time the deed was executed; that they agreed with J. L. Murphy to convey the property in question to him with the understanding that he would continue to reside with them during the remainder of his life; that without their request or solicitation he had inserted in the deed the language which conveyed to him only a life estate; that he agreed to pay them a reasonable compensation for his care, which they deemed to be $15 a month, in addition to the rental of the house, and that they continued to live together under this arrangement until February, 1937, when J. L. Murphy demanded that their son-in-law and daughter, who were also making their home in the house, be caused to leave. A reply was filed to the answer and counterclaim in which the affirmative allegations were denied. The issues having been joined, proof was taken and the judgment upholding the deed and dismissing the appellant's petition was entered.

J. L. Murphy was approximately 95 years of age when the deed in question was executed. He received a $30 Confederate pension each month. He had some money in the bank and held postal savings certificates in the amount of several hundred dollars. He had disposed of his real estate several years before 1936. There is evidence to the effect that a few parties owed him sums of money in 1936 which he had loaned them. He

had told the appellant and others that he intended to pay off the indebtedness against the appellees' home. The appellant testified that he advised his father not to do this, but that he did it anyway. Two witnesses who testified in support of the appellant's contention as to J. L. Murphy's mental condition had borrowed money from him between 1934 and 1936. The testimony for the appellant, including that of one doctor, was to the effect that J. L. Murphy was old, feeble and childish, and 'had been declining for several years. The witnesses stated generally that they did not think he was capable of understanding a contract or transacting business in August, 1936. The doctor testified on cross examination, however, that Murphy always paid him what he owed him, and appeared anxious to keep his accounts paid up. This doctor testified that in addition to certain physical ailments, Murphy was suffering from senile dementia. A daughter of J. L. Murphy, who testified for the appellant, said that he had told her that it was his intention to give the home to Mary Emma Lester at his death. The substance of the testimony of the numerous witnesses for the appellees is to the effect that they thought J. L. Murphy's mind was sound. Several of these witnesses had had dealings with him during recent years.

We do not deem it necessary to go into the testimony as to why the appellees left their home in 1937, and what transpired thereafter, since the question before us concerns primarily the mental condition of J. L. Murphy at the time he accepted the deed from the appellees in August, 1936. That these three parties had lived together for several years prior to that date is undisputed. While there is some indication that there was friction between J. S. Lester and J. L. Murphy at times, there is evidence that Murphy had said that he intended to save the Lester home, and that he wanted to leave his daughter Mary Emma a home at his death.

In urging reversal appellant stresses principally our decisions to the effect that the law looks with suspicion upon transfers of property involving persons mentally and physically infirm and those having custody of them, and that the burden is on the claimant to show complete fairness of the transaction. Numerous cases are cited by the appellant, most of which involve situations where the mental condition of, and the question of undue influence upon, the grantor have been raised, but even under these rules with the burden of proof upon

the appellees we think that the chancellor correctly held that they bore the burden.

In the recent case of McCutcheon v. Bichon, 267 Ky. 694, 103 S. W. (2d) 76, 82, a deed from an aged parent to his son with whom he had been living was attacked. The lower court held that it had been obtained by the exercise of undue influence. This Court, however, reversed the lower court. In that case it was said:

"In cases where it is sought 'to set aside a deed on the ground of mental incapacity, it is not sufficient to show that the grantor's powers of mind and body were impaired by age, but there must be evidence from which it is made to appear that his infirmity of mind was so great as to render him incapable of knowing or understanding the nature, meaning, and consequence of the transaction.'" Cases cited.

In commenting upon the evidence given by laymen, as well as by some of the physicians who testified, it was said in the McCutcheon Case:

"As to the charge of mental incapacity, we recognize the rule that the evidence of laymen on this question is to be limited to acts and circumstances, which may or may not show a lack of mind sufficient to enable one to contract. The question of the quality of mind is one peculiarly directed to the medical profession. As to the effect of the lay proof, we do not find anything in any of it which would tend to convince us that Mr. McCutcheon at the time of conveying the property did not have mind enough to know the effect of his act. True he was shown to be old and infirm; to some extent forgetful, living somewhat in the past as do most old persons. Some of the physicians say that he did not have mind enough to contract. This testimony is not convincing. As a basis for their conclusion, they do not detail such conditions or circumstances as would be other than persuasive."

In the case of Parsley v. Parsley, 233 Ky. 42, 24 S. W. (2d) 931, 932, in commenting upon the evidence given by some of the witnesses as to the mentality of an old man who had executed certain deeds, it was said:

"We are not impressed by the evidence of many of the witnesses that the old man's mind was gone.

because they were forced on cross-examination to admit that, after these deeds were made, one leased the old man's home farm from him, one built a barn for him, one bought a cow from him, one bought a wagon, one bought his timber, etc. According to them, the old man was perfectly able to contract with any one except Ike.''

In the case before us most of the evidence as to J. L. Murphy's mental condition was given by lay witnesses, and as pointed out above, some of these witnesses had transacted business with him a short time before they testified as to his mental condition. We have no hesitancy in reaching the conclusion therefore, that the ruling of the chancellor in dismissing the appellant's petition was correct. While J. L. Murphy was old and feeble, and doubtless in poor health in August, 1936, we think the appellees met fully the burden placed upon them to defend the transaction under which they conveyed to him a life interest in the property in question.

Wherefore, for the reasons given herein, the judgment is affirmed.