## Mays et al. v. Mays et al.

(Decided March 27, 1936.)

WM. LEWIS for appellants.

H. C. CLAY for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER
—Affirming.

The appellants here, sixteen or more in number, are sons and daughters (with their respective spouses) and grandchildren of Patrick Mays, deceased, while the appellees are the son and daughter-in-law; this son being of a second marriage of the father.

By the petition it was sought to cancel a deed to real estate and a written contract conveying personal property to the son Otis; the grounds of attack being that at the time of the execution of the documents Patrick Mays (the father) was not of sufficient mental capacity to contract; that if he was of such capacity he was unduly influenced; and that there was a want of consideration, which we take to mean that grantee had not performed the services which constituted the moving consideration. The pleadings, in all, properly presented an issue on the above points.

On the trial of the case, the chancellor, viewing the pleadings, exhibits, and proof, denied the claim of appellants and held that Otis had title to the real estate under the deed and was entitled to the personal property under the contract. It is here contended that the proof warranted a contrary finding.

From the mass of proof we learn that Patrick Mays was married three times. There were eight or nine children born of the first marriage, boys and girls; one child, Otis, born of the second marriage; no children were born of the third. Otis' mother died in 1918, as best we can gather from the record. Otis lived with his father from birth until November, 1919, when his father married his third wife. Soon after this marriage, Otis moved to Lincoln county, thence to Hamilton, Ohio, thence to Indiana, and finally back to Hamilton, where he was living when his father (the third wife having died in the meantime) importuned him to cease wandering and come home and live with him. It is shown that after the death of the third wife, one Baker and mem-

bers of his family had been living with Patrick Mays, but they were preparing to leave, and learning of this Otis sent his wife and child to the home of deceased, and in a short while, a week perhaps, he followed, and some time in November, 1929, they began life in the home of the father. Otis brought very little property when he returned to his father's house. He continued to live with his father until the latter's death some time in July, 1932.

The deed and contract, sought to be annulled, were both executed on November 18, 1931. The deed conveyed a described tract of land containing about 183 acres, the recited consideration being $1.00 cash in hand paid, and in consideration of services of the second party (Otis) "in taking care of the party of the first part, and for the further consideration of the care and keeping the party of the first part the remainder of his life." The personal property contract was executed in pursuance of a verbal contract between Otis and his father of November 16, 1929, in which it was stated that the father had promised to give Otis all personal property owned by him at this death, "as a part of the consideration for the care and keeping of the party of the first part during his lifetime," in addition to the grant of the real estate. The deed was duly acknowledged, and the contract was signed by both parties, attested by three witnesses.

In appellants' brief it is conceded that if on November 18, 1931, Patrick Mays "was of such mental condition as to know the nature of his estate, appreciate its value, his moral obligations to his children, and was able to make a rational survey of his properties, both contracts should be upheld, "unless, even if he was mentally sound, he was not unduly influenced." Taking this concession at face value, there is eliminated from consideration the question as to whether or not Otis rendered service to his father to such extent as would constitute consideration for the father's execution of the two documents.

The proof shows that the farm conveyed to Otis by his father was estimated by appellants to be of value from $3,000 to $5,000; by witnesses for appellee its value was estimated at from $1,500 to $3,000. The personal property, consisting of farming implements, etc., left at his death was of little value. It is shown that from October, 1929, up to September 15, 1931, deceased

deposited at various times $688.62 in bank. It is not shown that he had this at his death. It seems to be fairly shown that in 1919 the father gave Otis a check for $250, which Otis paid on a farm in Lincoln County. It is also attempted to be shown that the father gave Otis $750 about the time of the death of Otis' mother. However, it serves no purpose to discuss how much Otis received in 1919; how much the farm was worth in 1931 or now; or the value of the personal property left by Patrick Mays, since under the pleadings the only question is whether or not the conveyances were voidable because of such alleged then existing disability on the part of Patrick Mays as would preclude him from validly contracting, or that he was unduly influenced to make the conveyance.

The depositions of some 29 or 30 witnesses were taken by appellants. Of this number 12 were children, grandchildren, sons, or daughters-in-law. Others were neighbors, who, like appellants, occasionally visited the old man in the years from 1928 to 1932: the latter being the year of his death. Reading the depositions it may be said that undisputed proof shows that Patrick Mays was about 84 years of age when he executed the challenged documents; that he suffered at times from colds, some slight asthmatic trouble, and for a long time from a severely aggravated affliction of eczema; the latter to such an extent as required constant attention to give him relief. We can also say that the proof shows that his eyesight was not any too good, and he was slightly deaf. It is also clear from proof that up to a short time prior to his death he was quite active for a person of his advanced age, and was a man generally considered to be of at least, if not above ordinary intelligence.

Each and every witness testifying for appellants was asked the technical question as to whether or not during the latter years of his life Patrick Mays had mind enough to know the value of his property; to dispose of it according to a fixed purpose, recognizing his moral obligations and duty to his children. To these questions nearly all answered, "I don't think so," or "I hardly believe he did." "I wouldn't want to transact any business with him." "At times he would and at times he wouldn't." Also being asked if his mind was bad, the answers were practically of the same tenor. Since none of these witnesses qualified as experts (and this includes the doctor druggist who testi-

fied), their opinions alone were of no probative value, hence of no aid to the court in deciding a question touching the quality of one's mind. Schrodt's Ex'r v. Schrodt, 181 Ky. 174, 203 S. W. 1051; Wigginton's Ex'r v. Wigginton, 194 Ky. 385, 239 S. W. 455; Bodine v. Bodine, 241 Ky. 706, 44 S. W. (2d) 840; Smith v. Smith, 243 Ky. 240, 47 S. W. (2d) 1036; Godman et al. v. Aulick et al., 261 Ky. 268, 87 S. W. (2d) 612.

However, witnesses may describe actions and doings of a person, from which a court or a jury may determine whether a person is or is not of sound mental condition, and there is proof here by appellants as to the actions of Patrick Mays for a period covering several years before his death bearing on this point.

Viewing the testimony of the thirty witnesses we find that the children, grandchildren, and sons and daughters in law would visit the old man occasionally and he would not know them; this was true as to some of his neighbors. One witness says: "The old man would take a stick and job it down like a wild man, his mind came and went. A grandson was plowing with two mules, but the old man wanted me to use one." (It developed that he wanted to give one a rest while the other pulled the plow.) "He would some times ask the same thing over and over." Another witness said he met the old man one day and he addressed him as some other person. The doctor, who "supposed" he was Mr. May's family physician, said that he called on him in 1932, and "he didn't know me; his mental condition was such that I wouldn't have traded with him." However, it was developed that the doctor was only at the home three times in three years, and the last time was long after the deed was made. A great deal was made of the fact that many of the children said that the old man did not have mind enough to correctly list his property, because he gave his farm in to the assessor for two or three years at a value of $3,000, and they say that Otis thought that for this reason his mind was wrong, yet 15 witnesses for appellants, including appellants, testified as to the value, and their estimate ranged from $2,500 to $5,000.

The above is a fair presentation of the character of testimony on which it is asked that the court declare Patrick Mays to have been of unsound mind at the time the contracts were executed. As to the matter of undue influence, it is said by almost every witness for appel-

lant that they thought he could have been influenced, but nothing is shown that hints at undue influence, except, perhaps, the circumstance that about the time the deed was made Otis was threatening to leave, but did not do so.

More than 40 witnesses were introduced for appellees, few, if any, related to deceased, and, while they all practically agreed that Mr. Mays was physically feeble during his last few years, they most assuredly dissipated any notion which might have been formed from a reading of appellant's proof, that the old gentleman was feeble mentally. True, they do not picture him as being a mental giant, but the impression cannot be escaped that he was a man who knew at all times what he was doing, and what he wanted to do, and to be done. So it is from their proof we are impressed with the idea that he was a man not easily influenced. The deputy clerk, who wrote the deed and contract, says that when written it was at the old gentleman's dictation; he knew what he wanted to be done and how it should be carried out. Other witnesses, who were with him about the time the conveyances were made, are emphatic in their testimony. Their testimony is unimpeached, and the chancellor was in a position to gauge and weigh their testimony at short range, and from a survey of the proof we are constrained to say that the court had ample support for his conclusion that Patrick Mays had sufficient mind to understand the nature, force, and effect of the contracts; that he was not unduly influenced; and that the consideration for the conveyances was performed.

A comparison of the facts developed in this case with those in Norton v. Norton, 219 Ky. 612, 294 S. W. 191; Combs v. Bowen, 255 Ky. 802, 75 S. W. (2d) 513; Middleton v. Skaggs, 263 Ky. 81, 91 S. W. (2d) 1016, decided March 6, 1936, will show a striking similarity. In each of those cases we held that the proven disability was insufficient to justify the court in canceling an executed contract; to justfy cancellation the proof ought to be clear, substantial, and convincing, since any court in ordering a cancellation is exercising an extraordinary power. Lossie v. Central Trust Co., 219 Ky. 1, 292 S. W. 338; Perry v. Thomas, 232 Ky. 781, 24 S. W. (2d) 603; Provident Life & Accident Co. v. Ramsey, 256 Ky. 126, 75 S. W. (2d) 781.

In cases of this sort the chancellor's finding is

resolved in favor of his conclusion, and where substantially supported by the evidence will not be disturbed, Henson v. Jones, 247 Ky. 465, 57 S. W. (2d) 498, and when there is evidence to sustain chancellor's finding, this court is without authority to set the judgment aside. Sandy Hook Bank's Trustee v. Bear, 252 Ky. 609, 67 S. W. (2d) 972. Although there may exist in the mind of this court a doubt as to the soundness of the chancellor's conclusion, such doubt is always resolved in favor of the judgment below. Mortgage Union of Penn. v. King, 245 Ky. 691, 54 S. W. (2d) 49. The principle announced in the foregoing cases is so well established and universally recognized that further citations need not be noted. We may well adopt the closing paragraph in Middleton v. Skaggs, supra, as fitting here, where, in speaking of the quality of evidence relied on, we said:

> "If this were sufficient to show mental incapacity, it would put it out of the power of every old man to make his will. Clearly the facts relied on do not tend in the least to show that at the time of the execution of the will testator did not have sufficient mental capacity to enable him to know the natural objects of his bounty, his obligations to them, the character and value of his estate, and to dispose of it according to a fixed purpose of his own."

We are of the opinion that the court below correctly balanced the evidence, and found the weight to favor the conclusion that the conveyances in all respects were valid.

Judgment affirmed.