## Martine v. Roadcap et al.

Jan. 19, 1940.

Lawrence S. Grauman for appellant.

Raymond C. Stephenson and Farnsley, Hottell & Russell for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

Mrs. Josie Wilkerson died April 6, 1937, leaving property valued at about $3,750. Her sole heir at law was appellant, a sister. Her will, executed July 14, 1936, was probated April 13, 1937.

Appellant prosecuted appeal from the order of probate, seeking to have the will set aside on the ground that testatrix was mentally incapacitated at the time of its execution. She was bequeathed $5. Other bequests were: Deaconess Hospital, $200; a niece, Virginia Maybach, $100; Kate Dollick, who had rendered nursing service to testatrix, $100; Walter Satterwhite, $100; Lloyd Roadcap, Jr., $200; Kosair Crippled Children's Hospital, $50; Daughters of America Orphans' Home,

$100. The residue was bequeathed to the Epworth M. E. Church in Louisville.

After proof and unchallenged instructions, nine members of the jury signed a verdict declaring the will valid; judgment was entered accordingly. On appeal it is contended that the verdict is contrary to law. and not supported by the evidence.

Testatrix was sixty-eight years of age at the time of her death; appellant was thirteen years her junior. The husband had died in 1935, and prior to his death both he and the wife had been accustomed to the use of alcoholic liquors. It is gathered from the proof that following his death, testatrix used ardent spirits to a considerable extent, at times succumbing to the influence.

Appellant testifies that she and her sister were on friendly terms, except for the resentment on the part of testatrix at her frequent suggestions that testatrix change her habit in regard to the use of liquor. Evidently, such suggestions by the sister were made in the best of spirit. Witness says that when she would broach the subject testatrix would become offended, and would retort: "I am paying for the whiskey," and she would reply: "You know it is harming you, why not give it up," and testatrix would answer: "As long as I am able to buy whiskey I am going to buy it." She once offered to share her home with testatrix on condition that she would not bring whiskey to the home; testatrix declined. It is apparent that testatrix had conceived the notion that these salutary suggestions were nothing less than an attempt to interfere in her personal affairs. On one occasion she so expressed herself.

Two physicians who had attended Mrs. Wilkerson testified as to her mental and physical condition; Dr. C. B. Shaklette, from March, 1936, after Dr. Wade Shaklette had been discharged, as he says, because he had endeavored to have her refrain from drinking. He first saw testatrix at the Deaconess Hospital in March, 1936. He said that she had been on a drunk; was irrational and did not know what she was doing, and it was difficult to get her to remain in bed. She was given sedatives until she became sober, remaining in the hospital about two weeks, then returning home.

The cause of her "being out of her head," and difficult to control, was "the use of alcohol." The doctor did not know how long she had been a user, but her ap-

pearance gave evidence of the fact that she was accustomed to strong drink. In describing her physical condition he said:

"She had heart trouble, what is termed a cardio-vascular condition; she also suffered from cirrhosis of the liver, causing the abdomen to fill with fluid. She was mentally disturbed at times; sometimes she knew what she was doing; at other times she did not."

He described testatrix as being highly nervous, "especially when she was getting over one of these sprees." He endeavored to keep her off of alcohol, but when he made such suggestions she did not react favorably. Later, the doctor testified that testatrix "had arteriosclerosis and alcoholic psychosis; hardening of the arteries, and the mental disorentation might have resulted from age and the drinking of fermented liquors over a long period," and she was suffering from the last-named diseases in May, 1936.

At times when the doctor talked to her she could not converse intelligently; "at other times I would see her and she would be able to carry on a conversation." At one time (in March, 1937) she was disturbed very much, and on one occasion did not recognize her physician. The doctor testifies that from March 1936 until her death, her condition became worse. He thought the continued use of alcohol would result in a progression of the mental disturbance.

The doctor visited Mrs. Wilkerson on July 14, 1936, also on the 15th and 16th. He was called then, apparently to treat her for the abdominal trouble and not for alcoholism. On the 14th he withdrew a quantity of ascitic fluid, but he does not testify as to her mental or physical condition, other than the abdominal trouble, at this time.

On cross-examination the doctor said Mrs. Wilkerson did not discuss her relatives, her business affairs, or the value of her estate. He said that at times she knew what she was doing. Her only difficulty was when on the sprees, and while he would not appraise her as being able to talk in an extra-intelligent manner, he said: "She had mind enough to know what she wanted, and had a will of her own and wanted things her way."

Witness says that when he saw her on the day she

made her will, "she was drinking some;" he would not say she was drunk. When asked whether or not in his opinion she then had sufficient mind and memory to make a rational will, the witness parried by saying:

"Well, I just can't answer that question. I did not know she was going to make a will; I don't remember that date any better than I do any other dates, because I did not know until a couple of days ago that she had made her will."

"By the Court: Doctor, on any occasion, at any time, do you think deceased had mind enough to know that she had relatives, and her natural obligations to them, the value of her estate, and to dispose of it according to the way she wanted to? A. Well, she probably did when she was sober."

The remainder of the testimony, save that of an expert medical witness, was a detailing of certain acts and doings of testatrix, by her neighbors, who in most instances, attributed her lack of ability to make a will (according to rules) because of her habitual use of whiskey. Her neighbors would observe that on occasions she was so intoxicated, in her yard or garden, that she would fall and have to be assisted into the house. Mrs. Hawes, who lived next door to testatrix for a year and a half, said this happened, "I would say a dozen times in that period; however, when sober Mrs. Wilkerson was a very good neighbor, nice and friendly in every way. She would drink whiskey and get sick and fall around." This witness also said that at times she had hallucinations; "she would see things and they would be as real to her as if they were real," giving one or two instances. Asked the formal question as to mental capacity, based on her observations, she said:

"Well, when she was drunk I know she did not have; when she was sober she might have had. I won't say she did then, but I know she didn't when she was drunk."

On cross-examination this witness said she thought she knew she had a sister and owned property, and "seemed to have a mind of her own about her own business, and had plenty lucid intervals" during 1936.

It would serve no useful purpose to detail the testimony of the few other lay witnesses, since it may be generally stated that from their testimony, testatrix was

addicted to strong drink; at times to excess. It is clear that when under its influence she was ill-disposed, irritable and difficult to manage, and at times irrational. It is equally clear from the testimony of lay witnesses that she had a strong will; was a woman of fixed determination, to the extent that she would not brook interference, and that she had many lucid intervals, during which she was agreeable, well-disposed, and capable of carrying on her business affairs.

Dr. Solomon, a recognized medical authority, was called as an expert witness. Such testimony as he gave was based on a fairly prepared and propounded hypothetical query and after hearing a history of the case from Dr. C. B. Shaklette, with a reading of the hospital chart, made up during Mrs. Wilkerson's visits in November of 1936, and in 1937.

He testified as to ailments in accord with Dr. Shaklette, except as to personal observations, as he had never seen testatrix. His opinion was that in March 1937 she was psychotic; that she died of pneumonia. The doctor defined alcoholic psychosis as being alcoholic insanity; in her case, perhaps acute. In answer to the hypothetical question, he expressed the opinion that in July 1936 it was impossible for her to know the value of her estate; the objects of her bounty, or to make such disposition as she would want to make if she were in possession of her faculties.

While the doctor thought that testatrix was an alcoholic psychotic during the entire involved period, with semi-lucid intervals, during which he opined that "she might know she was thirsty and drink water," and probably knew she owned a house and had one sister, "these things were gross and not definite fine points. If she drew fine distinctions it was by accident," hence he concluded that the various bequests to strangers were by accident, since not made under normal, natural conditions or legal requirements.

Dr. Wade Shaklette who had been the family physician prior to Mr. Wilkerson's death, continued as such thereafter and attended testatrix until she discharged him, as above stated. He had known her for about twenty-five years; treated her while she was in the hospital in March 1936. He characterized her as being, in later years, a "hard drinker." He attended her inter-

mittently for three months prior to March, during which period he says:

> "Her physical condition, beyond the bronchial trouble, was good. When she was from under the influence of liquor, I could not say she was mentally affected from the use of alcohol. When she was under the influence her disposition was to bawl out every person who came around her, and was angry and ugly in her disposition. As far as being competent to handling her own property, she was as much so as the average person, I would say, under the influence of liquor."

Testatrix did not discuss business or family affairs with the witness, though he says that she mentioned the sister, "and was irritated because she did not come and visit her, or could not come and stay with her during her illness. She was religiously inclined, spoke kindly of her church, and appreciated attention from members of the congregation." From the doctor's observation, his opinion was that she was not an alcoholic psychotic; her blood pressure was high, perhaps brought on by age or the use of liquor. He had never detected evidence of schlerosis or cirrhosis during his attendance.

Speaking of her mental condition and her ability to make a will, the doctor admitted that the continued use of whiskey was "making inroads" and she might later have developed the disease attributed by the other doctors. In answer to the formal question, he answered:

> "Well, when I knew her, when she would anyways near sober up, I am bound to say that she was a woman of very clear mind, and above the average along business lines; she had been the business head of the family for all those years. You take a person of that type and you will find them at times when the mind is clear; they act very bright; very intelligently. She was a strong-minded woman."

Charles Pauley and his wife lived for sometime in the house with testatrix. They witnessed her signature to the will. Both said that Mrs. Wilkerson was in the habit of using alcoholic liquor. One of them (the wife) saw her drunk on two occasions between June and October, 1936. The wife (and others) saw persons bring packages from a nearby saloon and cafe. This was a daily occurrence, and the witness thought the packages contained whiskey. It developed from other proof that

testatrix would order articles of food from the tavern; that she generally bought the whiskey herself, and this was said to have been on an average of two half-pints a week, but other testimony indicates purchases and consumption of greater quantities.

The wife heard Mrs. Wilkerson discuss the making of her will with an attorney, who came to the home. She had called the attorney at the request of testatrix. Mrs. Wilkerson was in bed; had been tapped for fluid that day. Witness says:

"She knew what she was doing; she had a mind of her own and attended to her own business. I have seen her intoxicated pretty well, but she always signed her own name or talked about business or anything."

This witness had heard testatrix say that she did not want her sister to have any of her property.

Mr. Hardy, a close friend, visited Mrs. Wilkerson at intervals during 1936 and 1937; she would call him to take her to the bank; just before her death she gave him very definite directions as to the manner of her burial, which were not followed because of objections interposed by appellant. He took her to the hospital in October or November, 1936. She discussed matters in a sensible, rational manner. The same was true when he took her on the periodical visits to the bank. This witness was of the opinion, based on observation, that in 1936, she had sufficient mind to make a rational will; "she attended to her own business. Every time we had dealings with her she went to the bank and drew her money in cash. She would not let anyone else attend to it for her." Though a close friend, he did not know she was accustomed to strong drink or became intoxicated. "I never saw her that way in my life."

Two bank-tellers testified, one from a bank where she kept her savings and checking accounts, the other from a bank where she kept a lock box. They testify as to her periodical trips to the banks, on which occasions testatrix attended to her business matters and discussed them in a rational manner. The teller of the bank where she had her lock box, said he used his efforts more than once to get her to transfer her account to his bank. She refused and gave the very sensible reason, that the other bank had always been nice to her and her husband. They never knew of her drinking; neither detected indi-

cations and both were of the belief that in July 1936 she was competent to make a reasonable will.

Several members of her church testified; one the secretary, another the treasurer. They, and other members of the church, testify that she was a contributor, and until she moved to the country, a regular attendant. She had served as president of the Ladies Aid, "and made the best one we ever had." Not one of them knew or had ever heard of her using intoxicating liquor. One member, a close friend who saw her at intervals, never detected indications of whiskey. She went so far as to say that no matter who testified otherwise she could not believe it. All these witnesses express the opinion that she was a woman of strong will, and knew at all times what she was doing, and wanted done. Other friends and neighbors testified, as did some servants who had worked for testatrix. In most instances they say that she did drink occasionally, and some say that she would become intoxicated, but all agree that when she was sober she was fully capable of attending to business matters.

Mrs. Dollick, a practical nurse, attended her on her visits to the hospital, and at times at her home, visiting her frequently in 1936. Witness thought that at all times testatrix knew her property, its value and her relatives; she did not know she was a drinking woman. The testimony of others is to the effect that testatrix was at all times, save perhaps when under the influence of liquor, competent to make a rational will. The testimony of these bankers, friends, neighbors, and fellow-church members, show beyond cavil that during all the time in question, there were many periods when she could make a rational and reasonable will.

The will was written by a reputable attorney, called to the home on July 14, 1936, for the purpose of drafting the paper. He testified at great length and detail. He had known testatrix for three or four years, and during the time had attended to legal matters for her and her husband. After the husband's death in 1935, she called him for advice as to administration of her husband's estate. None was necessary, as there was a survivorship agreement.

Testatrix at that time discussed with him the matter of descent of her property after her death. The chief concern was whether or not the sister would inherit.

The attorney correctly advised her on this point, and testatrix disclosed the fact that it was her desire that the sister get no part of the estate because she and the sister did not get along agreeably and she "had run through with one estate, and she did not want her running through with hers."

The attorney, in February, 1936, had drafted a will at the dictation of testatrix, which was exhibited. That will was in effect the same as the later one, except the name of the sister was not mentioned in the former, nor was there a bequest to Mrs. Dollick. When the second will was written the attorney went to the home at her call; she was in bed but got up; put on a wrapper and sat on the side of the bed; the witness says: "She was apparently all right; she showed no indications of having been drinking." Witness also says they discussed each and every item of the will, and she knew what she wanted to do with her property. She had theretofore given reasons for devising her property to friends and charitable purposes.

It seems that testatrix had conceived the notion that if the sister's name be omitted from the will it would be set aside. She wanted this taken care of by bequeathing to the sister a small sum, so that she would not be charged with overlooking her. She also gave sensible reasons for including Mrs. Dollick, saying that she had been very kind to her.

After the notes were made, the attorney went to a nearby bank; typed the will and returned to her home, where it was signed and subscribed. At both these times, says the witness, Mrs. Wilkerson discussed matters in a rational, intelligent way, and was then in mental condition to make a rational will. Witness never visited testatrix socially, but in his business contacts never detected indications of whiskey, and says, "she was a shrewd woman."

From the foregoing testimony it is not difficult to conclude that testatrix was addicted to the use of alcohol, at times to excess; nor is it difficult to conclude that her several ailments, or some of them, were caused by the excessive use of alcohol, which at times, perhaps, affected her mental ability to a degree.

While the facts and conclusions above may be admitted, we may say that the proof sufficiently demonstrates that testatrix had frequent lucid intervals. The

fact is apparent from a reading of the proof, that it was only when she was on, or getting over one of her "sprees," that she was incompetent to attend to business. The testimony of the attorney is entitled to considerable weight and has received same. It is true, as said by appellant, that several witnesses for propounders were devisees or interested, but the sums bequeathed were hardly large enough to justify them in bending their testimony in favor of the validity of the will; their testimony is to be given due credit in the absence of a challenge other than a minor interest.

Counsel for appellant relies mainly on the cases of Duval v. Duval, 249 Ky. 186, 69 S. W. (2d) 351; Osborn v. Paul, 272 Ky. 694, 114 S. W. (2d) 1134, and Mullins v. Mullins, 229 Ky. 103, 16 S. W. (2d) 788, 790. In the Mullins case, the facts tending to manifest mental incapacity are given in detail, and upon a reading we are convinced that the facts upon which contestants base their charge of incapacity here, fall far short of the facts therein detailed.

Counsel for appellant argues that the will is an unnatural one, because the sister was cut off with a small devise. It is true we have written that when the provisions of a will are unreasonable or unnatural, such may be considered as an element of proof showing the quality of mind. We wrote (quoting) in the Mullins' case, that the testator has the right to pauperize even his helpless defendants, "if at the time he does it he is mentally sound, knows his estate, the nature and value of it; has a fixed purpose as to its disposition, and of his own free will and accord makes such disposition * * *. But the unnatural act in so doing may be considered as evidence * * * in determining whether he was mentally competent to make a will at the time he put into execution his unnatural act."

Here, it may be admitted that on the face it appears unnatural for testatrix to have willed the sister only $5. However, she apparently had a reason for her act; whether this be so or not, this phase of the proof was to be considered by the jury in determining the pivotal question.

We have compared the testimony in this case with the meager detailed testimony in the Osborn-Paul case, supra [272 Ky. 694, 114 S. W. (2d) 1135], in which we affirmed judgment based on a jury's verdict against the

will. In that case we found a decidedly worse condition existing. Paul was a confirmed inebriate for ten years, he had "only occasional glimmering periods of complete soberness; but which lasted but a short while." He was extremely cruel toward his family; he was frequently in jail on the charge of drunkenness; was placed in hospitals and sanitariums for treatment for inebriety. The facts here do not measure up to the Paul case, in which we correctly said, "that * * * each case is determinable upon its own facts."

The matter of the testator's habit as to drinking was apparently a minor item of proof in the Duval case, supra. Both the medical and lay witnesses' testimony, with regard to mental incapacity, was augmented by testimony showing exercise of undue influence. In that case we affirmed a judgment of the lower court finding against the will. We said [249 Ky. 186, 60 S. W. (2d) 354]:

"In seeing and hearing the parties and witnesses testify, the jury had better opportunity to determine the weight to be given their evidence than can the court from a reading of the record. Many things appear in the trial to lend color and weight to the evidence which do not appear in the record. Viewing the record as a whole, it is manifest that there is substantial evidence to support the verdict and in the circumstances this court is not authorized to interfere."

Having given the most careful consideration to the testimony, we may go so far as to say that it is our opinion that the evidence in favor of the validity of the will is quite enough to have justified the jury in reaching its expressed conclusions. Compare favorably as to facts and conclusions reached in this case, Mays v. Mays, 263 Ky. 546, 92 S. W. (2d) 827; Godman v. Aulick, 261 Ky. 268, 87 S. W. (2d) 612, 613; Sheeley v. Chilton's Adm'r, 236 Ky. 221, 32 S. W. (2d) 974; Clark v. Johnson, 268 Ky. 591, 105 S. W. (2d) 576; Thomas v. Thomas' Adm'r, 258 Ky. 236, 79 S. W. (2d) 982; Nugent v. Nugent's Adm'r, 281 Ky. 263, 135 S. W. (2d) 877.

Our conclusion is that the judgment below should be and it is, affirmed.