## Tartar v. Eaton et al.

March 8, 1940.

J. S. Sandusky, Judge.

220

Kennedy & Kennedy and R. C. Tartar for appellant.

B. J. Bethurum and Charles J. Walker for appellees.

OPINION OF THE COURT BY JUDGE TILFORD—Reversing.

Simpson Phelps was a member of the Bar and apparently continued to practice his profession until a few days before his death, which occurred on December 19, 1937. At that time he was over seventy years of age, and for some years previously had been subject to moments of forgetfulness and guilty of idiosyncracies of conduct which caused many people, including two physicians, one of whom had treated him, to believe that his mental faculties were impaired. Probably the worst of his lapses occurred in the fall of 1937, when, upon the resumption of an adjourned hearing of a law suit in which he was counsel for an old negro woman, he denied that he had been employed or knew anything about

the case. Shortly afterward, however, he tried the law suit, which appears to have been a complicated one involving a boundary line, and won it. It also appears that he sometimes lost his bearings and was unable to find his way home without direction, and that upon two occasions he attempted to change his clothes in a room in a house occupied by himself and his nephew's family, seemingly unaware of the fact that there were women present. The record is too voluminous to admit of a detailed discussion of all the peculiar actions with which he is charged, and uncontradicted, would be sufficient to justify the conclusion that he did not possess sufficient mental capacity on June 9, 1937, to execute the deed which is the principal subject of this controversy. However, the proof that he did possess sufficient mental capacity to execute the deed in question is of such a nature as to convince us that many, if not all of the peculiarities of his conduct were the result of infirmities of age, or, perhaps the use of liquor. In any event, many witnesses testified that they regarded him as of sound mind, and it is conclusively shown that during May and June, 1937, he filed suits and successfully practiced his profession, and in September, 1937, he was appointed by the Judge of the Pulaski Circuit Court to defend a man indicted for a felony. Moreover, Mr. J. Tanner Ottley, Commonwealth's Attorney for the Twenty-ninth Judicial District, testified that on November 22, 1937, Phelps attended a trial in Burksville, Kentucky, as a witness, stayed there for three days in communication with Mr. Ottley, was sworn in as a member of the Bar at Burksville, gave his testimony and displayed no evidence of mental incapacity. Phelps' wife had died in 1932, and for six years prior to his death he had occupied office space with the appellee, Eaton.

On January 4, 1938, Eaton instituted this suit against the appellant Eliza Tartar and Felix Phelps, Administrator of Simpson Phelps, alleging that on "the —— day of ——, 19—," Phelps, with Eaton as surety, had executed a note to the Citizens National Bank at Somerset for $500, payable six months thereafter, and that on "the —— day of ——, 19—," Eaton was compelled to pay the note, and that at that time in order to indemnify Eaton against loss, Phelps had executed to him a mortgage on a tract of land containing about

fifty acres, which mortgage Phelps promised to have recorded, and that only $100 had been paid on the note. Neither the note nor the mortgage was filed, and it may be here remarked that no witness was introduced to prove either the writing or the acknowledgment or the delivery of the mortgage, and it is conceded that no such mortgage was ever recorded. It was further alleged in the petition that Phelps had executed a deed to the appellant, Eliza Tartar, which had been duly recorded, and that this deed was executed to the said Eliza Tartar without consideration, and at a time when Phelps "was of unsound mind, and acting under fraud and duress from the said Eliza Tartar;" and "that the said defendant, Tartar, at the time she received said deed from the said Simpson Phelps knew that the plaintiff was the owner of said mortgage given him by reason of his having signed said note to the said Bank." The prayer of the petition was that the plaintiff be awarded judgment against the administrator for the alleged debt; that plaintiff be awarded a lien on the land to secure it, and that the deed from Phelps to Eliza Tartar be cancelled. Eliza Tartar answered, traversing the allegations of the petition; and thereafter, L. B. Phelps and others, claiming to be heirs of Simpson Phelps and his wife, Pina Phelps, from whom Simpson Phelps had received the property under a will giving him full power of sale and disposition, filed an intervening petition which they made a cross petition against Eliza Tartar, and in which they likewise sought a cancellation of the deed in question upon allegations similar in effect to those contained in Eaton's petition. To this intervening petition, the appellant filed her answer and counter-claim, traversing the allegations of the intervening petition, and affirmatively pleading her purchase of the land from Phelps for $3,000. By reply and agreed order traversing all the affirmative allegations of the pleadings not otherwise traversed, the issues were joined, and under an agreed order the testimony was heard orally by the Chancellor and reported by the official stenographer. The result of this hearing was that the Chancellor cancelled the deed and awarded Eaton a judgment for $400 with interest from the "——— day of ———, 19—," and a lien on the land to secure its payment.

As before indicated, the testimony in this case is

voluminous, and it would be impossible within the limits of this opinion to set it forth with any degree of particularity. It is, however, necessary to add to what we have already written concerning the testimony, the following particulars relative to the deed, the circumstances under which it was executed, and the alleged payment of a consideration therefor by the appellant.

Phelps, it seems, owned other real estate, and appellant also appears to have possessed some property. Phelps apparently twice sold the farm in litigation, but in each instance had been compelled to repossess it. On January 16, 1937, he had leased part of one of his other properties to appellant for the year 1937, for a cash consideration of $300. In April, 1937, while the title to the farm in litigation was in one of the two persons to whom Phelps had sold it, appellant, under some arrangement with the title holder, moved into the residence. The rental contract for the other property was for some reason abandoned, and shortly after she had moved on to the farm in litigation, appellant entered into negotiations with Phelps for its purchase. In the meantime Phelps took up his abode with appellant and her husband, who, it seems, had other lodgers. The deed conveying the property was written by Phelps in his office in Somerset on June 9, 1937, acknowledged before the County Court Clerk at the latter's office, and immediately recorded. It is a properly drawn deed and discloses no weakness in the intellect which composed it. The recited consideration was $1000.00 and "other valuable considerations," and following the description of the farm was inserted this paragraph:

"Grantor is to have a home in said house and place as long as he lives or as he wants said home."

It also contained this clause:

"The party of the second part is to hold the place free from the contracts, debts, obligations of her husband and he is not to share in any part of same and is not to have dower or homestead in any part of same."

Appellant proved by her father and several of her sons that she paid $1,000 in cash to Phelps when the deed was executed, and that later on she made two cash payments of $125 and $1,575 respectively. These pay-

ments, plus the $300 which she paid on the abandoned rental contract and for which apparently she was given credit, made up the total of $3,000 which she claims to have paid. The Chancellor expressed the belief that she did not make any of these payments, and it must be acknowledged that there were many suspicious circumstances connected with the transaction, such as the failure of appellant to produce receipts, the fact that the payments were made in cash, and the fact that Phelps was hard up for money following the alleged payments. But several unimpeached witnesses testify that they saw the payments made, and the appellant satisfactorily shows that she came into possession of approximately enough money in cash during the period immediately preceding the payments, to have made them. Moreover, some of appellees' witnesses testify that Phelps, during the latter years of his life, spent money on several lewd women, and came into possession of and dissipated other substantial sums which apparently he did not deposit in bank. Although several witnesses testified that appellant's reputation for truth, veracity, and morality was bad, and it was shown that she had divorced her husband and that a few months before executing the deed Phelps had made a will leaving everything to her in the event he died within a year, nevertheless, there is no evidence showing the existence at any time of any improper relations between appellant and Phelps, or that she possessed or exerted any control or undue influence over him. In all probability he was, or imagined himself to be, in love with her, but there is no proof to that effect. Giving full consideration to all the evidence introduced by appellees, including the fact that Phelps, subsequent to the execution of the deed in negotiating with real estate agents for the sale of property, occasionally spoke of the property in question as his own, and in qualifying as surety on appeal bonds made affidavits that he owned the property on which he lived, nevertheless, the proof is not sufficient to overcome the positive testimony of witnesses that the consideration claimed to have been paid by appellant to Phelps for the farm was actually paid. Moreover, many of the statements attributed to Phelps were self-serving and not made in the presence of appellant.

Thus we are brought face to face with the question

whether the Chancellor was justified, because of the suspicions which he entertained and which we share, in annulling the deed in question. This is not a case where the relationship between the parties is shown to have been of such a nature as to cast the burden of proving the fairness of the transaction upon the appellant, and the burden of establishing mental incapacity and undue influence was upon the appellees. A person possessed of sufficient mental capacity to understand the nature and consequences of his act, may, of his own free will, give, or, for any lawful consideration he sees fit to accept, sell his property to whomsoever he chooses. Petrey's Adm'r v. Petrey, 262 Ky. 222, 90 S. W. (2d) 4, 5: Saylor et al. v. Saylor et al., 282 Ky. 216, 138 S. W. (2d) 316. In our opinion the appellees failed to establish any of the elements necessary to entitle them to the relief sought. McCutcheon v. Bichon, 267 Ky. 694, 103 S. W. (2d) 76. The power of a court of equity to set aside an executed conveyance is an extraordinary one which should never be lightly exercised (Petrey's Adm'r v. Petrey, supra); and while ordinarily we give great weight to the findings of the Chancellor on questions of fact, we do not feel justified, upon the evidence before us, in holding either that Phelps did not have mental capacity sufficient to understand the nature and consequences of his act in conveying the property in question to appellant, or that appellant did not pay a valuable consideration for the conveyance. Moreover it is extremely doubtful that the pleading attacking the conveyance was sufficient for that purpose, since it failed to disclose the degrees of relationship of the alleged heirs, or any facts upon which their alleged heirship could be predicated.

Neither are we able to uphold that part of the Chancellor's judgment which awarded the appellee, Eaton, a lien on the land in question, as, whatever may be said as to the sufficiency of the proof that the mortgage which he claims was executed, was, in fact, executed, the fact remains that the mortgage was never produced or recorded, or shown to have existed except by the incompetent testimony of Eaton, and there is no proof of any probative value whatever that appellant had notice of such a mortgage at the time Phelps conveyed to her the real estate which it is claimed the mortgage covered.

Counsel for appellees claim that since no written exceptions were filed, the incompetency of the testimony given in violation of Sub-section 2 of Section 606, Civil Code of Practice, was waived. However, they apparently overlook the fact that the proof in this case was heard orally by the Chancellor who ruled upon the objections as they were made, and that in each instance an exception to the ruling of the Court was noted. We are of the opinion that under such circumstances the filing of written exceptions would have been a burdensome and useless formality, and that written exceptions are required only where testimony is taken by depositions which are later submitted to the Court for consideration. Sections 586 and 587, Civil Code of Practice.

Judgment reversed with directions to dismiss the intervening petition, and so much of the original petition as seeks a lien upon the real estate conveyed by Phelps to appellant.