## CALDWELL et al. v. HATCHER et al.

Court of Appeals of Kentucky.
Feb. 8, 1952.

Rehearing Denied June 6, 1952.

Baird & Hays, Pikeville, for appellants.

Herman G. Dotson, Pikeville, for appellees.

CLAY, Commissioner.

This action was brought by appellees to cancel a deed executed by J. Floyd Hatcher, conveying land to the principal appellant. The conveyance was made by an elderly man to an unrelated young married woman. The issue involved is mental capacity. The Chancellor set aside the deed. Both parties have submitted excellent briefs on this appeal.

In 1929 "Uncle Floyd" lived with his sister and her husband on what is known as the "Hatcher Farm." In that year the sister employed appellant, then 12 years of age, as a household servant. In 1936 she married and her husband joined her on the farm. On January 6, 1938, Floyd, who was at that time 74 years of age, executed the deed in controversy, conveying her in fee simple his interest in the land. The recited consideration was: "Party of the second part taking care of party of the first part during his natural life and also in consideration of her caring for party of the first part in the past, in waiting on and caring for party of the first part."

At that time Floyd's nearest relatives were his sister Mary, with whom he lived, and appellees, two sons whom he had scarcely seen in 30 years. Floyd and his wife had permanently separated in 1907, and she had taken the two infant sons with her. They were complete strangers to their father Floyd, one of them having come to see him only once during his lifetime. Floyd

died in 1944, six years after the deed was executed, delivered, and recorded. Shortly thereafter this suit was filed.

█ Our first question, and one of importance, involves the burden of proof. As a general rule it will, and should be presumed that one conveying property has sufficient mental capacity to do so, the burden of proving otherwise being upon those who question it. See Bevins et al. v. Lowe et al., 159 Ky. 439, 167 S.W. 422; Petrey's Adm'r v. Petrey, 262 Ky. 222, 90 S.W.2d 4; Tartar v. Eaton et al., 282 Ky. 219, 138 S.W.2d 342. As an exception to the rule, appellees rely upon the principle that where the grantee has custody of the grantor, or a confidential relationship exists between them and the grantee is the stronger character, then the latter has the burden of showing the transaction was fair. See McDowell v. Edwards' Administrator, 156 Ky. 475, 161 S.W. 534.

█ The difficulty with appellees' argument is that appellant did not have custody of Floyd, nor was a confidential relationship shown to exist between them, nor was it established that she was a stronger character. Appellant was a mere child, when she came to live in the house with Floyd, working as a housekeeper for him and his sister. It is true he was very fond of appellant. She was good to him and he to her, but the record does not suggest any fiduciary relationship or control. There is no valid reason to shift the burden of proof. Therefore the controlling issue is whether or not appellees' evidence was sufficiently strong to overcome the presumption of capacity, the apparent rationality of the act, and the positive testimony of appellant's witnesses.

We return to the undisputed facts. Appellant came to work in Floyd's household when she was 12 years old. She helped take care of him for years, and performed for him many services. He was grateful. He bought her clothes and gave her money. After she and her husband moved to a new place not far away, it was Floyd's custom to visit her practically every day. This was in effect his second home. As one of the witnesses testified: "He seemed to think of her as a daughter."

Coming to the controversial matters, it appears the deed was drawn by an attorney,

Mr. J. A. Runyon. He testified that a few days before it was executed Floyd came to his office with the intention of making a will. The question of whether a will or a deed would be most appropriate was discussed, and Floyd left to think the matter over. He returned a few days later to the lawyer's office, and the deed was drafted, signed, acknowledged and recorded. Mr. Runyon testified that it was made in conformity with Floyd's wishes, and that he appeared competent to execute such an instrument. No one else was present on either occasion.

After the deed was executed, Floyd participated in other business transactions about which no one questioned his capacity until this suit was filed. He, together with appellant and her husband, executed a mortgage on this property not long after it had been conveyed. Several witnesses who testified to his incompetency were interested in that transaction. They are in the difficult position of acknowledging the validity of a mortgage signed by him, and yet saying that he did not have the mental capacity to execute the deed upon which the mortgage was based. They explain this by saying that at that time they were more interested in securing the mortgage than in determining Floyd's mental capacity.

Subsequent to the execution of the mortgage, Floyd traded some lands with certain neighbors, and he seemed to understand what he was doing. Other witnesses testified that he capably managed the farm; that he rented out gardens; that he loaned money (and insisted upon its being repaid); and that he otherwise competently engaged in other business transactions. Two doctors whose testimony questions his mental capacity admitted that he promptly paid his doctors' bills. His physical health had always been good.

We shall now look at the other side of the picture. It was shown that Floyd was in some respects peculiar and eccentric. His principal failing, according to appellees' witnesses, was his fondness for little girls. He customarily would talk to them and about them. He would buy them candy and clothes, and would sometimes give them small amounts of money. He had a good income from mineral royalties, and to some

people he appeared to be squandering his money in buying things or giving away things to little girls and others.

He also had a penchant for writing down numbers. As trains went by he would write down on the side of the house numbers which he saw on coal cars, or would write them on pieces of paper. He also listed license plate numbers. He would often pick up worthless objects on the street, such as pieces of paper, cigarette packages, stones and other objects. It is not clear that this latter activity was indulged in to an appreciable extent prior to the execution of the deed. There is no doubt that as he grew older he became more peculiar, and as a matter of fact, in 1940 he was adjudged incompetent.

Floyd was forgetful. He sometimes forgot names, and even asked about people who were dead. Two doctors who had treated him from time to time testified concerning his mental condition. Dr. Flanary, after saying he did not have the mental capacity to understand a deed or contract, stated: "To start with, he was of low mentality, and during the years I was with him in practice, some days he appeared pretty good and some days he appeared clear off, especially where women were concerned." It seems the doctor's opinion was based principally on Floyd's actions during the last years of his life, and there is no doubt but what his peculiarities became more pronounced in his later years. The other doctor, A. G. Osborne, said: "I think he was a man of weak mind, or low mentality, easily persuaded. I don't think he was an idiot or insane."

It must be remembered that the important consideration is the grantor's mental condition at the beginning of the year 1938, which was more than 10 years prior to the time appellees' witnesses testified. It is obvious they recalled more clearly the eccentricities of Floyd in the later stages of his life. For instance, the most damaging testimony of Hibbard Porter, one of appellees' principal witnesses, related to the actions of Floyd after the year 1941 and after he had been adjudged incompetent. Such testimony, even if competent, throws little light on Floyd's mental capacity on January 6, 1938.

The guiding principles in a case of this sort are set forth in Hagemeyer et al. v. First Nat. Bank & Trust Co. et al., 306 Ky. 774, at page 776, 209 S.W.2d 320, at page 321, as follows: "* * * mental weakness alone does not justify the annulment of a contract or deed if it is not such an infirmity as to destroy the party's power to act voluntarily and to appraise the consequences of his act; courts will hesitate to upset a transaction which is entered into in good faith and where no undue advantage or fraud is shown; and the true test is the person's capacity to understand and assent to the particular transaction in question."

In Newman v. Winter et al., 303 Ky. 841, at page 843, 198 S.W.2d 502, at page 503, we said: "We have also held that where a grantor understood what he was doing, the deed, if fairly obtained, was valid, notwithstanding grantor's extreme age, weakened mental condition and eccentric behavior. See Hensley v. Hensley, 230 Ky. 575, 20 S.W.2d 444. Likewise, we have said that although the grantor may be physically unable to look after his property and although his mind may be enfeebled by age or disease, yet these conditions are not sufficient to render his deed voidable, if such grantor comprehended the meaning, design and effect of his acts at the time of the deed's execution." See also Revlett v. Revlett, 274 Ky. 176, 118 S.W.2d 150; and Burgess et al. v. Belford et al., 306 Ky. 711, 209 S.W.2d 90.

Appellees maintain the Chancellor erroneously ordered stricken that part of their petition wherein it was alleged that Floyd was adjudged a person of unsound mind in March 1940. We have considered that fact, but it is of little importance. The ultimate question was Floyd's mental competency on January 6, 1938. The subsequent adjudication may have indicated that prior to 1940 he was on the road to incompetency, but it does not establish this condition existed in 1938.

A court of equity exercises an extraordinary power when it sets aside a con-

veyance solemnly and freely entered into. If the grantor appreciates the character and consequences of his particular act, it is not the prerogative of the courts to work out for him a different distribution of his property. The entire record in this case makes it abundantly clear the grantor was affectionately disposed toward appellant, and if he was otherwise peculiar, he had a normal, fixed and rational desire to convey his property to her. To destroy this purpose and this deed, the burden upon appellees was heavy indeed. In our opinion they failed to overcome the presumption of mental capacity, so strongly supported by a preponderance of the significant evidence.

While ordinarily we will follow a finding of fact by a Chancellor upon conflicting proof, it is our clear conviction that on a difficult record the Chancellor erred in his conclusion. Under the circumstances, the judgment must be reversed. See Allen v. Rogers, 262 Ky. 744, 91 S.W.2d 17; McCutcheon v. Bichon et al., 267 Ky. 694, 103 S.W.2d 76; and Tartar v. Eaton et al., 282 Ky. 219, 138 S.W.2d 342.

The judgment is reversed.